**Chenoweth Law Group, PC**
Robert J. McGaughey, OSB No. 800787
bobm@chenowethlaw.com
Aurelia Erickson, OSB No. 126170
aerickson@chenowethlaw.com
510 SW Fifth Ave., Fourth Floor
Portland, Oregon 97204
Telephone: (503) 221-7958
Fax: (503) 221-2182

*Liaison Counsel for Plaintiff*

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DIANA DA SILVA, derivatively on behalf of EXPENSIFY, INC., | |
| Plaintiff, | Case No.: |
| vs. | |
| DAVID BARRETT, RYAN SCHAFFER, ANURADHA MURALIDHARAN, JASON MILLS, DANIEL VIDAL, TIMOTHY CHRISTEN, ELLEN PAO, YING (VIVIAN) LIU, BLAKE BARTLETT, and ROBERT LENT, | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| EXPENSIFY, INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

## INTRODUCTION

Plaintiff Diana Da Silva ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Expensify, Inc. ("Expensify" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants David Barrett ("Barrett"), Ryan Schaffer ("Schaffer"), Anuradha Muralidharan ("Muralidharan"), Jason Mills ("Mills"), Daniel Vidal ("Vidal"), Timothy Christen ("Christen"), Ellen Pao ("Pao"), Ying (Vivian) Liu ("Liu"), Blake Bartlett ("Bartlett"), and Robert Lent ("Lent") (collectively, the "Individual Defendants" and together with Expensify, the "Defendants") for breaches of their fiduciary duties as controlling shareholders, directors and officers of Expensify, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and Section 21D of the Exchange Act against Defendants Barrett, Schaffer, Bartlett, and Lent. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Expensify, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

///

///

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Expensify's controlling shareholders, officers, and directors from November 11, 2021, through November 8, 2023, both dates inclusive (the "Relevant Period").

2.      Expensify claims to operate as an expense management software platform that "helps the smallest to the largest businesses simplify the way they manage money." To this end, Expensify created a cloud-based platform that purportedly simplifies the way businesses manage their finances.

3.      The Company was originally created to improve the experience of everyday employee expense management. Today, Expensify's users can use the software to accomplish a variety of tasks, such as managing payments, designing invoices, and paying bills.

4.      On October 15, 2021, Expensify filed a registration statement on Form S-1 with the SEC in connection with the Company's initial public offering ("IPO"). The registration statement was declared effective by the SEC on November 9, 2021 (the "Registration Statement") and was signed by Defendants Barrett, Schaffer, Bartlett, and Lent. The Company filed a prospectus on Form 424B4 with the SEC in connection with the IPO on November 12, 2021. The prospectus incorporated and formed part of the Registration Statement (the "Prospectus" and, collectively with the Registration Statement, the "Offering Documents").

5.      Pursuant to the signed Registration Statement, on or around November 11, 2021, Expensify conducted the IPO, and the Company's common stock began publicly trading on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "EXFY."

6.      The Registration Statement represented that the Company employed a "bottom-up" business model that depended upon customers' word-of-mouth recommendations based on the Company's reputation, especially amongst its customers and channel partners. Indeed, the

Registration Statement maintained that the "bottom-up" business model was essential to the Company's growth and allowed Expensify to avoid millions of dollars in operating expenses ordinarily caused by traditional top-down marketing. Further, the Registration Statement represented that the Company's "bottom up" business model gave Expensify access to a $16 billion total addressable market.

7.      The Registration Statement also emphasized that the success of Expensify was dependent on "converting users who try the free aspects of the Expensify platform into paid members. While our viral model means that employees or contractors often introduce Expensify into SMBs, companies subscribe and pay for the majority of our paid members." As such, the Company's ability to maintain and grow its customer base – particularly at an annual rate – was essential to its financial success.

8.      However, the Registration Statement did not address nor disclose certain events which had caused irreparable harm to the Company's reputation prior to the filing of the Registration Statement. Unbeknownst to investors who purchased Expensify shares in the IPO, the Company's tarnished reputation forced Expensify to abandon its "bottom-up" business model and drove the Company to initiate a sharp price increase that doubled (and in some cases, tripled) the price of subscriptions, in May 2020. This led to a decrease in customer retention and negatively impacted member expansion.

9.      Additionally, in October 2020, Expensify's Chief Executive Officer ("CEO"), Defendant Barrett, sent an email pushing his own political agenda to the Company's nearly 10 million users. In this email, he threatened that a vote against President Joe Biden would be a "vote against democracy." Many customers immediately responded to the email by declaring their disgust with the Company as well as their plans to either cancel or not renew their subscriptions.

These events had a severe negative impact on customer retention, member expansion, and Expensify's reputation among its customers and partners.

10.     The Registration Statement did not disclose the Company's abandonment of its touted business model, the fallout from Defendant Barrett's politically charged email, the harm they caused, nor the Company's need to change its fundamental business model and growth strategy. Rather, the Registration Statement presented Expensify as a Company that actively embraced a "bottom-up" business model and had a robust customer base, giving the investing public no reason to presume Expensify's brand, reputation, and market opportunities had already been eviscerated.

11.     The truth only became clear well after the IPO once customer contracts began expiring without renewal and seat expansion (which refers to the number of users or licenses tied to a subscription). Analyst downgrades, along with various revelations from Expensify's management, flagged to investors that the Company was much weaker than represented and differed in material ways from what the Registration Statement had provided.

12.     The truth began to emerge on June 12, 2023, when Morgan Stanley downgraded the Company from Equal-weight to Underweight. In downgrading the Company, Morgan Stanley cited Expensify's risk-reward profile and structural challenges for the primary reasons behind the downgrade.

13.     On this news, the Company's stock price fell $0.45 per share, or 6.28%, to close at $6.72 per share on June 12, 2023.

14.     Approximately two months later, on August 8, 2023, the truth continued to emerge when the Company issued a press release to announce its second quarter of 2023 financial and operating results ("Q2 2023 Results"). The press release revealed, in part: (1) GAAP EPS of $0.14,

missing the consensus estimate of -$0.07, which equated to revenue of $38.9 million compared to the missed consensus estimate of $41.5 million; (2) net loss of $11.3 million, a $3.3 million increase compared to the same period last year; and (3) non-GAAP net loss of $1.0 million.

15.    That same day, on August 8, 2023, the Individual Defendants discussed the Q2 2023 Results in an earnings conference call with investors and analysts. During the call, Defendant Muralidharan stated, "I'll say this, for a few quarters now, since the day we went public really, we have not been in sort of normal or stable economic conditions."

16.    As a result of these disclosures, JMP Securities issued an analyst report on August 9, 2023, titled, "Expensify, Inc. (EXFY) 'In a Bit of a Rebuilding Phase' with GAAP Revenue Down 10% Y/Y; Downgrading to MP." In this report, JMP downgraded Expensify from Market Outperform to Market Perform.

17.    On this news, the Company's stock price fell further. The Company's common stock price fell $1.69 per share, or 28.55%, to close at $4.23 per share on August 9, 2023.

18.    On September 15, 2023, J.P. Morgan issued an analyst report titled, "Attractive fundamentals, but challenging business model; Initiate with Underweight," assigning an "Underweight" rating to Expensify, citing "limited differentiation vs. competitors that aid in easing expense management, bill paying, invoicing, etc." and "challenging revenue mix and distribution model."

19.    On this news, the Company's stock price fell $0.35 per share, or 9.19%, to close at $3.46 per share on September 15, 2023.

20.    The truth fully emerged on November 7, 2023, when the Company issued a press release announcing Expensify's Q3 2023 financial and operating results ("Q3 2023 Results"). The press release revealed, in part, that: (1) GAAP loss for Q3 of $0.21 per share, equating to revenue

of $36.5 million, marking a 14% decrease compared to the same period last year; (2) net loss of $17 million, an $8.8 million increase compared to the same period last year; and (3) non-GAAP net loss of $6.7 million.

21.     Following these statements, Piper Sandler issued an analyst report the same day titled "Mired in Another Quarter of Execution Missteps; Lowering Estimates, PT of $2." In this statement, Piper Sandler lowered its target share price for the Company's stock from $4.00 to $2.00 based on "increasing execution risks and lower estimates."

22.     On this news, Expensify's common stock price continued to fall. The common stock price fell $1.07 per share, or 36.89%, to close at $1.83 per share on November 8, 2023.

23.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements in the Offering Documents. The Offering Documents failed to disclose, *inter alia*, that: (i) the Company's revenue growth was exponentially susceptible to macroeconomic and structural challenges; (ii) consequently, the Company exaggerated the efficiency of Expensify's business model and the likelihood of success in meeting the long-term growth projections referenced in the Offering Documents; (iii) due to the foregoing, the Individual Defendants overstated Expensify's post-IPO growth, business, and financial prospects; and (iv) the Company did not maintain adequate internal controls. As a result, Expensify's public statements were materially false and misleading at all relevant times.

24.     In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Expensify to repurchase its own stock at prices that were artificially

inflated due to the foregoing misrepresentations. Indeed, between May 1, 2023, and May 31, 2023, approximately 504,493 shares of Expensify's common stock were repurchased, costing the Company over $2.9 million.

25.     In further breach of his fiduciary duties, Defendant Barrett also failed to maintain internal controls while engaging in lucrative insider trading, reaping personal profits exceeding $5,780,964.

26.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

27.     In light of the Individual Defendants' misconduct—which has subjected the Company, its CEO, its Chief Financial Officer ("CFO"), its Chief Operating Officer ("COO"), its Chief Product Officer ("CPO"), its Chief Strategy Officer ("CSO"), two of its former directors, and the entire Board of Directors (the "Board") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Oregon (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein— the Company will have to expend many millions of dollars.

28.     The Company has been substantially damaged because of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

29.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in

this derivative action and of various of the directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

30.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)), and Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act.

31.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

32.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

33.    Venue is proper in this District because Expensify is headquartered in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

34.     Plaintiff is a current shareholder of Expensify. Plaintiff has continuously held Expensify common stock at all relevant times.

### Nominal Defendant Expensify

35.     Nominal Defendant Expensify is a Delaware corporation that is headquartered at 401 SW 5th Avenue, Portland, Oregon 97204. Expensify stock trades on the NASDAQ under the ticker symbol "EXFY."

### Defendant Barrett

36.     Defendant Barrett is the founder of Expensify. Defendant Barrett has served as the Company's CEO and as a Company director since August 2009. He also serves as the Chair of the Compensation Committee and signed the Registration Statement.

37.     According to the Company's Schedule 14A filed with the SEC on April 28, 2023 (the "2023 Proxy Statement"), as of April 24, 2023, Defendant Barrett beneficially owned 13,660,023 shares of the Company's Class A common stock. His Company stock ownership includes 6,388,574 shares of the Company's Class A common stock, 3,600,066 shares of the Company's LT10 stock, and 3,671,383 shares of the Company's LT50 stock, representing 45.8% of the total voting power of the Company—making Defendant Barrett a controlling shareholder of the Company. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023, was $8.04, Defendant Barrett owned approximately $51,364,135 worth of Expensify Class A common stock as of that date.

38.     For the fiscal year ending on December 31, 2021 ("Fiscal Year 2021"), Defendant Barrett received $19,967,553 in total compensation from the Company. This included $1,056,728 in salary and $18,910,825 in stock awards. For the fiscal year ending on December 31, 2022

("Fiscal Year 2022"), Defendant Barrett received $1,654,892 in total compensation from the Company. This included $1,606,327 in salary and $48,565 in stock awards.

39.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Barrett made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| October 12, 2022 | 30,000 | $13.86 | $415,800 |
| November 10, 2022 | 30,000 | $12.33 | $369,900 |
| December 14, 2022 | 30,000 | $9.56 | $286,800 |
| January 11, 2023 | 30,000 | $9.08 | $272,400 |
| February 8, 2023 | 30,000 | $9.80 | $294,000 |
| March 9, 2023 | 30,000 | $8.28 | $248,399 |
| April 12, 2023 | 30,000 | $8.17 | $245,100 |
| May 10, 2023 | 30,000 | $5.99 | $179,700 |
| June 1, 2023 | 200,000 | $6.55 | $1,310,000 |
| June 14, 2023 | 30,000 | $6.99 | $209,700 |
| July 12, 2023 | 30,000 | $7.52 | $225,600 |
| August 9, 2023 | 30,000 | $4.26 | $127,800 |
| September 8, 2023 | 263,333 | $3.96 | $1,042,798 |
| September 11, 2023 | 66,667 | $3.88 | $258,667 |
| September 12, 2023 | 20,000 | $4.09 | $81,800 |
| September 13, 2023 | 30,000 | $3.86 | $115,800 |
| October 11, 2023 | 30,000 | $3.19 | $96,700 |

Thus, in total, before the fraud was exposed, Defendant Barrett sold 940,000 shares of Company Stock on inside information, for which he received approximately $5,780,964 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

40.     Expensify's 2023 Proxy Statement stated the following about Defendant Barrett:

David Barrett founded Expensify and has served as our Chief Executive Officer and as a member of our board of directors since 2009. Prior to Expensify, Mr. Barrett led engineering for Red Swoosh, Inc., a peer-to-peer file sharing company, which was acquired by Akamai Technologies, Inc. in 2007. Mr. Barrett holds a B.S.E. in engineering from the University of Michigan. We believe that Mr. Barrett is qualified to serve as a member of our board of directors due to his strategic vision and leadership in conceptualizing and developing our brand and business, his expertise in technology and the perspective and experience he brings as our founder and Chief Executive Officer.

**Defendant Schaffer**

41.     Defendant Schaffer has served as the Company's CFO and as a Company director since 2017. He previously served as Expensify's Director of Marketing and Strategy from 2013 – 2017. He also serves as a member of the Compensation Committee. According to the Company's 2023 Proxy Statement as of April 24, 2023, Defendant Schaffer beneficially owned 1,020,213 shares of the Company's common stock. His Company stock ownership includes 496,588 shares of the Company's Class A common stock, 498,090 shares of the Company's LT10 stock, and 25,535 shares of the Company's LT50 stock, representing 1.4% of the total voting power of the Company. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023, was $8.04, Defendant Schaffer owned approximately $3,992,567.52 worth of Expensify Class A common stock as of that date.

42.     For Fiscal Year 2021, Defendant Schaffer received $9,552,730 in total compensation from the Company. This included $725,294 in salary, $5,128,747 in stock awards, $566,516 in bonuses, and $2,957,367 in all other compensation. For Fiscal Year 2022, Defendant Schaffer received $874,840 in total compensation from the Company. This included $864,750 in salary, $1,755 in stock awards, and $8,335 in all other compensation.

43.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Schaffer made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| November 15, 2021 | 119,996 | $25.11 | $3,013,099 |
| July 8, 2022 | 4,699 | $20.11 | $94,496 |
| July 29, 2022 | 4,699 | $20.01 | $94,026 |
| August 24, 2022 | 4,699 | $20.00 | $93,980 |
| June 21, 2023 | 7,750 | $8.04 | $62,309 |
| July 3, 2023 | 400 | $8.00 | $3,200 |
| July 13, 2023 | 7,350 | $8.00 | $58,800 |
| May 10, 2023 | 30,000 | $5.99 | $179,700 |
| June 1, 2023 | 200,000 | $6.55 | $1,310,000 |
| June 14, 2023 | 30,000 | $6.99 | $209,700 |
| July 12, 2023 | 30,000 | $7.52 | $225,600 |
| August 1, 2023 | 100 | $8.00 | $800 |
| August 31, 2023 | 3,900 | $4.39 | $17,121 |
| September 11, 2023 | 66,667 | $3.88 | $258,667 |
| September 29, 2023 | 4,000 | $3.28 | $13,120 |
| October 31, 2023 | 4,000 | $2.67 | $10,680 |

Thus, in total, before the fraud was exposed, Defendant Schaffer sold 518,260 shares of Company common stock on inside information, for which he received approximately $5,645,298 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

44.    Expensify's 2023 Proxy Statement stated the following about Defendant Schaffer: Ryan Schaffer has served as our Chief Financial Officer and a member of our board of directors since 2017, and he previously served as our Director of Marketing and Strategy from 2013-2017.

Mr. Schaffer worked in marketing at various companies prior to joining Expensify. Mr. Schaffer holds a B.S. in business from the University of Dayton. We believe that Mr. Schaffer is qualified to serve as a member of our board of directors due to his perspective and experience as our Chief Financial Officer, his experience leading our board meetings since 2019 and his significant knowledge of and history with our company.

**Defendant Muralidharan**

45.     Defendant Muralidharan has served as the Company's Chief Operating Officer ("COO") since January 2021 and has served as a Company director since November 2021. She previously served as Expensify's Director of Product Operations from January 2018 to January 2021 and as Head of Payment Operations from August 2015 to January 2018. She also serves as a member of the Compensation Committee. According to the Company's 2023 Proxy Statement, as of April 24, 2023, Defendant Muralidharan beneficially owned 322,458 shares of the Company's common stock. Her Company stock ownership includes 99,457 shares of the Company's Class A common stock, 114,140 shares of the Company's LT10 stock, and 108,861 shares of the Company's LT50 stock, representing 1.4% of the total voting power of the Company. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023, was $8.04, Defendant Muralidharan owned approximately $2,592,568.32 worth of Expensify Class A common stock as of that date.

46.     For Fiscal Year 2021, Defendant Muralidharan received $5,867,462 in total compensation from the Company. This included $163,732 in salary, $4,142,795 in stock awards, $634,414 in bonuses, and $575,109 in all other compensation. For Fiscal Year 2022, Defendant Muralidharan received $470,657 in total compensation from the Company. This included $447,040 in salary, $10,066 in stock awards, and $13,551 in all other compensation.

47.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Muralidharan made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 26, 2023 | 20,000 | $10.00 | $200,000 |
| June 13, 2023 | 14,390 | $7.00 | $100,730 |
| September 15, 2022 | 13,000 | $3.63 | $47,190 |

Thus, in total, before the fraud was exposed, Defendant Muralidharan sold 47,390 shares of Company stock on inside information, for which she received approximately $347,920 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

48.    Expensify's 2023 Proxy Statement stated the following about Defendant Muralidharan:

> Anu Muralidharan has served as our Chief Operating Officer since January 2021 and a member of our board of directors since our IPO. Ms. Muralidharan previously served as our Director of Product Operations from January 2018 to January 2021 and as our Head of Payment Operations from August 2015 to January 2018. Prior to joining Expensify, she held Vice President positions at Citibank and Marqeta Inc., and various engineering roles at Oracle. Ms. Muralidharan holds a B.E. in electrical and electronics engineering from Birla Institute of Technology and Science, Pilani in Pilani, India and an M.B.A from Cornell University. We believe that Ms. Muralidharan is qualified to serve as a member of our board of directors due to her long history and experience in the payments industry, comprehensive knowledge of payments systems, and perspective and experience as our Chief Operating Officer.

**Defendant Mills**

49.    Defendant Mills has served as the Company's Chief Product Officer ("CPO") and as a Company director since May 2021. He also serves as a member of the Compensation Committee. Defendant Mills previously served as Director of Products and Customers from

January 2013 to May 2021. According to the Company's 2023 Proxy Statement, as of April 24, 2023, Defendant Mills beneficially owned 1,229,269 shares of the Company's common stock. His Company stock ownership includes 103,816 of the Company's Class A common stock, 582,885 shares of LT10 stock, and 542,568 shares of LT50 stock, representing 6.7% of the total voting power of the Company. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023, was $8.04, Defendant Mills owned approximately $834,680.64 worth of Expensify's Class A common stock as of that date.

50.    Expensify's 2023 Proxy Statement stated the following about Defendant Mills:

Jason Mills has served as a member of our board of directors since our IPO. Mr. Mills has served as our Chief Product Officer since May 2021, and he previously served as our Director of Product and Customers from January 2013 to May 2021. Prior to Expensify, Mr. Mills served as an analyst intern at Zurich Financial from February 2010 to August 2010 and as an analyst intern at Goldman Sachs from June 2009 to August 2009. Mr. Mills holds a B.S. in Business Administration from the University of California, Berkeley, Haas School of Business and a Master of Arts in International Economics from Johns Hopkins University, School of Advanced International Studies. We believe that Mr. Mills is qualified to serve as a member of our board of directors due to his long history of leadership with our company, his perspective and experience as our Chief Product Officer and his comprehensive knowledge of our business.

**Defendant Vidal**

51.    Defendant Vidal has served as the Company's Chief Strategy Officer ("CSO") since May 2021 and as a Company director since November 2021. He previously served as Expensify's Director of Product and Customers from January 2013 to May 2021. He also serves as a member of the Compensation Committee. According to the Company's 2023 Proxy Statement as of April 24, 2023, Defendant Vidal beneficially owned 536,485 shares of the Company's common stock. His Company stock ownership includes 294,243 shares of the Company's Class A common stock, 112,650 shares of the Company's LT10 stock, and 129,592 shares of the Company's LT50 stock, representing 1.6% of the total voting power of the Company. Given that

the price per share of the Company's common stock at the close of trading on April 24, 2023, was $8.04, Defendant Vidal owned approximately $2,365,713.72 worth of Expensify Class A common stock as of that date.

52.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Vidal made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 15, 2023 | 5,000 | $9.82 | $49,100 |
| June 20, 2023 | 8,000 | $7.59 | $60,720 |
| September 1, 2022 | 5,000 | $4.39 | $21,950 |

Thus, in total, before the fraud was exposed, Defendant Vidal sold 18,000 shares of Company Stock on inside information, for which he received approximately $131,770 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

53.    Expensify's 2023 Proxy Statement stated the following about Defendant Vidal:

Daniel Vidal has served as a member of our board of directors since our IPO. Mr. Vidal has served as our Chief Strategy Officer since May 2021, and he previously served as our Director of Corporate Development & Strategy from February 2019 to May 2021 and Head of Business Development from August 2013 to February 2019. Mr. Vidal holds a B.S. in Kinesiology from Arizona State University and a Masters in Commerce from the University of Virginia. We believe that Mr. Vidal is qualified to serve as a member of our board of directors due to his long history of employment with our company, his perspective and experience as our Chief Strategy Officer and his leadership developing our Strategic Partnership program and ExpensifyApproved! Accountants program.

**Defendant Christen**

54.    Defendant Christen has served as a Company director since November 2021. Defendant Christen also serves as the Chair of the Audit Committee.  According to the Company's

2023 Proxy Statement as of April 24, 2023, Defendant Christen beneficially owned 21,173 shares of the Company's common stock. His Company stock ownership includes 21,173 shares of the Company's Class A common stock, representing less than 1% of the total voting power of the Company. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023, was $8.04, Defendant Christen owned approximately $170,230.92 worth of Expensify Class A common stock as of that date.

55.    Expensify's 2023 Proxy Statement stated the following about Defendant Christen:

Timothy L. Christen has served on our board of directors since the effectiveness of our IPO registration statement. Mr. Christen has served as a director of Mayville Engineering Company, a publicly traded value-added manufacturer, since June 2016 and serves as the Chairman of the Audit Committee. Mr. Christen served as Chairman and Chief Executive Officer of Baker Tilly US, LLP, a national public accounting firm, from June 1999 to May 2016. Mr. Christen also served as the non-executive Chairman of Baker Tilly International Ltd. from October 2017 to October 2021 and as a director of CPA.com, a CPA firm solutions and strategies provider, since February 2018. Mr. Christen also served as director of the American Institute of CPAs from 2014 to 2017, serving as Chairman from 2015 to 2016, and since January 2021 serves as a trustee of the Financial Accounting Foundation. Mr. Christen holds a B.S. in accounting from the University of Wisconsin-Platteville and is a licensed certified public accountant. We believe that Mr. Christen is qualified to serve as a member of our board of directors due to his over 38 years of accounting expertise and substantial strategy, risk and management experience over his 16 years as the Chief Executive Officer of a national public accounting firm and membership on the boards of various publicly traded companies.

**Defendant Pao**

56.    Defendant Pao has served as a Company director since November 2021. Defendant Pao also serves as a member of the Audit Committee. According to the Company's 2023 Proxy Statement as of April 24, 2023, Defendant Pao beneficially owned 19,291 shares of the Company's Class A common stock. Her Company stock ownership includes 19,291 shares of the Company's Class A common stock, representing less than 1% of the total voting power of the Company. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023,

was $8.04, Defendant Pao owned approximately $155,099.64 worth of Expensify Class A common stock as of that date.

57.    Expensify's 2023 Proxy Statement stated the following about Defendant Pao:

Ellen Pao has served on our board of directors since our IPO. Ms. Pao cofounded and has lead Project Include, a nonprofit advocating for diversity, equity and inclusion in technology companies, since December 2015. Ms. Pao has served as Chief Executive Officer and as a board member of Project Include since January 2017. Prior to Project Include, Ms. Pao served as Interim Chief Executive Officer and Executive Vice President of Business Development of Reddit, a social media platform, from April 2012 until July 2015. Prior to Reddit, Ms. Pao served as Chief Diversity and Inclusion Officer at Kapor Center and Venture Partner at Kapor Capital from January 2017 until March 2018. Ms. Pao holds a B.S.E in electrical engineering from Princeton University, a J.D. from Harvard Law School and an M.B.A from Harvard Business School. We believe that Ms. Pao is qualified to serve as a member of our board of directors due to her focus on diversity and inclusion and her experience as a board observer, board member, investor and advisor to technology startups since 2005.

**Defendant Liu**

58.    Defendant Liu has served as a Company director since November 2021. Defendant Liu also serves as a member of the Audit Committee. According to the Company's 2023 Proxy Statement as of April 24, 2023, Defendant Liu beneficially owned 20,119 shares of the Company's common stock. Her Company stock ownership includes 20,119 shares of the Company's Class A common stock, representing less than 1% of the total voting power of the Company. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023 was $8.04, Defendant Liu owned approximately $161,756.76 worth of Expensify Class A common stock as of that date.

59.    Expensify's 2023 Proxy Statement stated the following about Defendant Liu:

Ying (Vivian) Liu has served on our board of directors since our IPO. Ms. Liu has served as Chief Operating Officer and Chief Financial Officer of ContextLogic, Inc. (d/b/a Wish), a mobile ecommerce platform since November 2021. Prior to Wish, Ms. Liu served as Chief Financial Officer of Shutterfly, Inc., a retailer and manufacturing platform for personalized products, from April 2020 to November

2021. Prior to Shutterfly, Inc., Ms. Liu served as the Chief Financial Officer and Senior Vice President of Lexmark Inc., a printing solutions company, from July 2017 to April 2020. Prior to Lexmark Inc., Ms. Lui served as VP, Finance of Huawei Technology, an enterprise networking solutions company, from October 2016 until July 2017. Prior to Huawei, Ms. Liu spent eight years at Cisco in multiple finance leadership positions. Earlier in her career, Ms. Liu worked at Deloitte & Touche, Goldman Sachs and China Merchants Bank. Ms. Liu holds a B.A. in international finance from Shanghai University of Finance and Economics, an M.B.A from the University of Washington and is a licensed chartered financial analyst and certified public accountant. We believe that Ms. Liu is qualified to serve as a member of our board of directors due to her extensive finance and leadership experience.

### Defendant Bartlett

60.    Defendant Bartlett served as a Company director from January 2015 to November 2021. Defendant Bartlett resigned as a Company director immediately prior to the completion of the Company's IPO.

61.    Expensify's Prospectus stated the following about Defendant Bartlett:

Blake Bartlett has served as a member of our board of directors since January 2015. Mr. Bartlett has served as Partner of Openview Venture Partners, a venture capital firm, since November 2013. Prior to OpenView, Mr. Bartlett served as Vice President and an Associate at Battery Ventures, a venture capital firm, from July 2009 to October 2013 and an Associate at Kayne Anderson Capital Advisors, LP, a private equity investments firm, from June 2007 to June 2009. Mr. Bartlett holds a B.S. in business administration from the University of Southern California. We believe that Mr. Bartlett is qualified to serve as a member of our board of directors due to his extensive experience as a board member of various high-growth technology companies and his knowledge of our industry. Mr. Bartlett will resign from our board of directors contingent upon, and effective immediately prior to, the completion of this offering.

### Defendant Lent

62.    Defendant Lent served as a Company director from January 2015 to November 2021. Defendant Lent resigned as a Company director immediately prior to the completion of the Company's IPO.

63.    Expensify's Prospectus stated the following about Defendant Lent:

Robert Lent has served as a member of our board of directors since February 2018, and was previously on our board of directors from 2012 to 2015. Mr. Lent has served as Managing Partner at Hillsven Capital, a seed venture firm focused on internet, cloud, e-commerce and mobile, since 2006. Prior to Hillsven Capital, Mr. Lent co-founded and served as Vice President of Corporate Development for Ariba, Inc., a procurement and supply chain solution for businesses, which was bought by SAP AG. Mr. Lent holds a B.S. in business from the University of California, Berkeley and an M.B.A. from Harvard Business School. We believe that Mr. Lent is qualified to serve as a member of our board of directors due to his extensive experience as a board member of various high-growth software companies, his success as a founder and his knowledge of our industry. Mr. Lent will resign from our board of directors contingent upon, and effective immediately prior to, the completion of this offering.

**Relevant Non-Parties**

64.     The Securities Class Action, captioned, *Wilhite v. Expensify Inc., et al.*, Case No.: 3:23-cv-01784-JR, in the United States District Court for the District of Oregon incorporates statements from former employees of Expensify who offered their experiences as confidential witnesses. The following are confidential witnesses whose statements are referenced throughout this complaint before this Court.

*CW-1*

65.     CW-1 was employed by the Company from January 2016 to April 2023. During their time at the Company, CW-1 first worked as an enterprise account executive from January 2016 until February 2018. CW-1 then worked in the strategic sales lead & lead department from March 2018 to June 2020. CW-1 worked lastly as a sales manager and channel partner manager from June 2020 until April 2023. In that role, CW-1 oversaw a nine-person sales team in addition to managing Expensify's relationships with several of the top 100 accounting firms partnering with Expensify.

*CW-2*

66.     CW-2 was employed by Expensify as a business operations specialist and product operations associate from March 2015 to October 2022. In their role as a business operations specialist, CW-2 created audit processes for connected business bank accounts and bank transactions, rescinded services for restricted businesses, created new processes for locking bank accounts , and managed a global team who assisted with the same. CW-2 also took on the role of administrator for Expensify's Lexis Nexis account during her employment with Expensify. Additionally, CW-2 served as a products operations associate, where they assisted with building the data entry system at Expensify and worked with software engineers to develop its interface and remediate the platform's limitations. In their roles as a business operations specialist and product operations associate, CW-2 managed more than 200 independent contractors across two vendors; analyzed quantitative data to determine how to achieve better customer outcomes; helped develop Expensify's accounting partner onboarding processes and instructional documentation; and provided quality control and support for 1,200 agents.

*CW-3*

67.     CW-3 was hired as a marketing designer at Expensify in April 2019. They maintained this role until May 2022 and were based in San Francisco, CA throughout their employment. In this role, CW-3 worked on a brand refresh and various campaigns while designing brand merchandise, campaign materials, and promotional materials for Expensify Lounge, a complimentary cocktail bar in San Francisco that operated from April 2023 to November 2023.

*CW-4*

68.     CW-4 served as the events marketing and operations project lead at Expensify for almost six years, specifically from March 2018 to February 2024. CW-4 worked in Portland, OR. CW-4 reported that while in this role, they did not have a designated supervisor, but they did work

closely with Defendant Barrett. Additionally, CW-4 maintains that they developed strong relationships with key conference organizers from Suiteworld, Quickbooks Connect, and Scaling New Heights on Expensify's behalf while in this role. Further, CW4 collaborated closely with external vendors, developed a robust network in the event space, and organized and spearheaded a strategic 24-month advertising campaign that reached 17 cities.

### CW-5

69.    CW-5 was employed as the head of sales and sales enablement at Expensify from July 2014 to September 2023 where they worked with the sales team and marketing teams, and developed partnerships with Oracle and Netsuite.

### CW-6

70.    CW-6 worked as an accounts payable and payroll administrator, and compliance manager at Expensify from November 2021 to May 2023. In this role, CW-6 enhanced the billing coding process; automated the manual CAP review process; and programmed five unique revenue share calculations. CW-6 also worked as a customer success manager from November 2014 to November 2021 at Expensify. While working at Expensify, CW-6 was based in Ironwood, MI. In this role, CW-6 led the "Unhappy Customers" project, established best practices for retention and recovery and enhanced the quality assurance program. Prior to their departure, CW-6 started the compliance team; grew the compliance team by 86%; improved audit processing; and implemented findings from six audits.

### CW-7

71.    CW-7 worked as a customer success manager at Expensify for nearly two years, specifically from March 2021 to February 2023. In this role, CW-7 answered customer support calls from a queue.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

72.     By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of Expensify and because of their ability to control the business and corporate affairs of Expensify, the Individual Defendants owed Expensify and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Expensify in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Expensify and its shareholders to benefit all shareholders equally.

73.     Each director and officer of the Company owes to Expensify and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

74.     The Individual Defendants, because of their positions of control and authority as controlling shareholders, officers, and directors of Expensify, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

75.     To discharge their duties, the officers and directors of Expensify were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

76.     Each Individual Defendant, by virtue of their position as a controlling shareholder, officer, and director, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholders, officers, and directors of

Expensify, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

77.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

78.    To discharge their duties, the controlling shareholders, officers, and directors of Expensify were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Expensify were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Oregon, and the United States, and pursuant to Expensify's own Code of Ethics and Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Expensify conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Expensify and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Expensify's operations would comply with all applicable laws and Expensify's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

79.     Each of the Individual Defendants further owed to Expensify and the shareholders the duty of loyalty, requiring that each favor Expensify's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

80.     At all times relevant hereto, the Individual Defendants were the agents of each other and Expensify and were at all times acting within the course and scope of such agency.

81.     Because of their advisory, executive, managerial, and directorial positions with Expensify, each of the Individual Defendants had access to adverse, non-public information about the Company.

82.     The Individual Defendants, because of their positions of control and authority, were able to, and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Expensify.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

83.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

84.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning

the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

85.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Expensify was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

86.    Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

87.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Expensify and was at all times acting within the course and scope of such agency.

## EXPENSIFY'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *Expensify's Code of Conduct*

88.    The Company's Code of Conduct represents that it applies to "All directors, officers and employees of the Company and all of [Expensify's] subsidiaries and controlled affiliates are

expected to be familiar with the Code and to adhere to those principles and procedures set forth below. Covered Parties must conduct themselves accordingly, exhibiting the highest standard of business and professional integrity, and seek to avoid even the appearance of improper behavior."

89.    The Code of Conduct starts by providing that:

In accordance with the requirements of the Securities and Exchange Commission (the "SEC"), and the National Association of Securities Dealers Automated Quotations Stock Market ("Nasdaq") Listing Standards, the Board of Directors (the "Board") of Expensify, Inc. (the "Company") has adopted this Code of Ethics and Conduct (the "Code") to encourage:

- Honest and ethical conduct, including fair dealing and the ethical handling of actual or apparent conflicts of interest;

- Full, fair, accurate, timely and understandable disclosure;

- Compliance with applicable governmental laws, rules and regulations;

- Prompt internal reporting of any violations of law or the Code;

- Accountability for adherence to the Code, including fair process by which to determine violations;

- Consistent enforcement of the Code, including clear and objective standards for compliance;

- Protection for persons reporting any such questionable behavior;

- The protection of the Company's legitimate business interests, including its assets and corporate opportunities; and

- Confidentiality of information entrusted to directors, officers and employees by the Company and its customers.

90.    The Code of Conduct provides, as to "Conflicts of Interest," that:

A conflict of interest occurs when the private interests of a Covered Party interfere, or appear to interfere, with the interests of the Company as a whole.

For example, a conflict of interest can arise when a Covered Party takes actions or has personal interests that may make it difficult to perform his or her Company duties objectively and effectively. A conflict of interest may also arise when a

Covered Party, or a member of his or her immediate family, receives improper personal benefits as a result of his or her position at 1 the Company.

Each Covered Party has an obligation to conduct the Company's business in an honest and ethical manner, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships. Any situation that involves, or may reasonably be expected to involve, a conflict of interest with the Company, should be disclosed promptly to the Company's Audit Committee of the Board. This Code does not attempt to describe all possible conflicts of interest that could develop. Other common conflicts from which Covered Parties must refrain are set out below:

- Covered Parties may not engage in any conduct or activities that are inconsistent with the Company's best interests or that disrupt or impair the Company's relationship with any person or entity with which the Company has or proposes to enter into a business or contractual relationship.

- Covered Parties may not accept compensation, in any form, for services performed for the Company from any source other than the Company.

- No Covered Party may take up any management or other employment position with, or have any material interest in, any firm or company that is in direct or indirect competition with the Company.

91.    The Code of Conduct provides, as to "Compliance with Laws, Rules and Regulations," that:

The Company is obligated to comply with all applicable laws, rules and regulations. It is the personal responsibility of each Covered Party to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company.

The principal executive officer, principal financial officer, principal accounting officer or controller (or persons performing similar functions) of the Company (together, the "Senior Financial Officers") are also required to promote compliance by all employees with the Code and to abide by Company standards, policies and procedures.

Covered Parties located outside of the United States must comply with laws, regulations, rules and regulatory orders of the United States, including the Foreign Corrupt Practices Act ("FCPA") and U.S. export control laws, in addition to applicable local laws.

92.    The Code of Conduct provides, as to "Insider Trading," that:

Trading on inside information is a violation of federal securities law. Covered Parties in possession of material nonpublic information about the Company or companies with whom we do business must abstain from trading or advising others to trade in the respective company's securities from the time that they obtain such inside information until adequate public disclosure of the information. Material information is information of such importance that it can be expected to affect the judgment of investors as to whether or not to buy, sell, or hold the securities in question. To use nonpublic information for personal financial benefit or to "tip" others, including family members, who might make an investment decision based on this information is not only unethical but also illegal. Covered Parties who trade stock based on insider information can be personally liable for damages totaling up to three times the profit made or loss avoided by the respective Covered Party.

93.    The Code of Conduct provides, as to "Reporting, Accountability and Enforcement," that:

The Company promotes ethical behavior at all times and encourages Covered Parties to talk to supervisors, managers and other appropriate personnel, including the officers, outside counsel for the Company and the Board or the relevant committee thereof, when in doubt about the best course of action in a particular situation.

Covered Parties should promptly report suspected violations of laws, rules, regulations or the Code or any other unethical behavior by any director, officer, employee or anyone purporting to be acting on the Company's behalf to appropriate personnel, including officers, outside counsel for the Company and the Board or the relevant committee thereof. Reports may be made anonymously. If requested, confidentiality will be maintained, subject to applicable law, regulations and legal proceedings.

The Audit Committee of the Board shall investigate and determine, or shall designate appropriate persons to investigate and determine, the legitimacy of such reports. The Audit Committee will then determine the appropriate disciplinary action. Such disciplinary action includes, but is not limited to, reprimand, termination with cause, and possible civil and criminal prosecution.

To encourage employees to report any and all violations, the Company will not tolerate retaliation for reports made in good faith. Retaliation or retribution against any Covered Party for a report made in good faith of any suspected violation of laws, rules, regulations or this Code is cause for appropriate disciplinary action.

94.    The Code of Conduct provides, as to "Corporate Opportunities," that:

All Covered Parties owe a duty to the Company to advance the legitimate interests of the Company when the opportunity to do so arises. Covered Parties are

prohibited from directly or indirectly (a) taking personally for themselves opportunities that are discovered through the use of Company property, information or positions; (b) using Company property, information or positions for personal gain; or (c) competing with the Company for business opportunities; provided, however, if the disinterested directors of the Board determine that the Company will not pursue an opportunity that relates to the Company's business, a Covered Party may do so, after notifying the disinterested directors of the Board of intended actions in order to avoid any appearance of conflict of interest.

95.     The Code of Conduct provides, as to "Confidentiality," that:

In carrying out the Company's business, Covered Parties may learn confidential or proprietary information about the Company, its customers, distributors, suppliers, joint venture or other business partners. Confidential or proprietary information includes all nonpublic information relating to the Company, or other companies, that would be harmful to the relevant company or useful or helpful to competitors if disclosed, including financial results or prospects, information provided by a third party, trade secrets, new product or marketing plans, research and development ideas, potential acquisitions or investments, or information of use to our competitors or harmful to us or our customers if disclosed.

Covered Parties must maintain the confidentiality of all information so entrusted to them, except when disclosure is authorized or legally mandated. Covered Parties must safeguard confidential information by keeping it secure, limiting access to those who have a need to know in order to do their job, and avoiding discussion of confidential information in public areas such as planes, elevators, and restaurants and on mobile phones. This prohibition includes, but is not limited to, inquiries made by the press, analysts, investors or others. Covered parties also may not use such information for personal gain. These confidentiality obligations continue even after employment or service with the Company ends and in no way diminish any additional confidentiality obligations that may apply to Covered Parties by way of their employment agreements, separate confidentiality agreements with the Company, or otherwise at law.

96.     The Code of Conduct provides, as to the "Fair Dealing," that:

Each Covered Party should endeavor to deal fairly with the Company's customers, service providers, suppliers, competitors and employees. No Covered Party should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice. Inappropriate use of proprietary information, misusing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is also prohibited.

97.    The Code of Conduct provides, as to "Protection and Proper Use of Company Assets," that:

All Covered Parties should protect the Company's assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on the Company's profitability. All Company assets should be used only for legitimate business purposes. The obligation of Covered Parties to protect the Company's assets includes its proprietary information. Proprietary information includes intellectual property such as trade secrets, patents, trademarks and copyrights, as well as business, marketing and service plans, engineering and manufacturing ideas, designs, databases, records, salary information and any unpublished financial data and reports.

98.    The Code of Conduct provides, as to "No Rights Created," that:

This Code is a statement of certain fundamental principles, policies and procedures that govern the Company's Covered Parties in the conduct of the Company's business. It is not intended to and does not create any rights in any employee, customer, client, visitor, supplier, competitor, shareholder or any other person or entity. It is the Company's belief that the policy is robust and covers most conceivable situations.

99.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment. Moreover, four of the Individual Defendants violated the Insider Trading section of the Code of Conduct by engaging in insider trading. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## EXPENSIFY'S AUDIT COMMITTEE CHARTER

100.    The Company's Audit Committee Charter (the "Audit Committee Charter") states that the purpose of the Audit Committee "is to oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company."

101.    The Audit Committee Charter outlines the primary responsibilities of the Audit Committee:

II.  **Composition**.
The Committee must consist of at least three directors, subject to any available exception. Each Committee member must satisfy the independence requirements of the Nasdaq Stock Market LLC ("Nasdaq") and the more rigorous independence rules for members of the Audit Committee issued by the Securities and Exchange Commission (the "SEC"), subject to any available exception. Each Committee member must be able to read and understand fundamental financial statements, including a company's balance sheet, income statement and cash flow statement. In addition, at least one member of the Committee must be a financial expert as defined under SEC rules.

III.  **Meetings, Procedures and Authority.**
The Committee must meet at least once during each fiscal quarter.

The Committee may retain any independent counsel, experts or advisors that the Committee believes to be necessary or appropriate. The Company must provide for appropriate funding, as determined by the Committee, for payment of compensation to the independent auditor for the purpose of preparing or issuing an audit report or performing other audit, review or attest services, for payment of compensation to any independent counsel, experts or advisors employed by the Committee and for payment of ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

IV.  **Duties and Responsibilities.**
*Interaction with the Independent Auditor*

1.  *Appointment and Oversight.* The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the

Company, and the independent auditor and each such other registered public accounting firm must report directly to the Committee.

2. *Annual Report on Independence.* The Committee must ensure that the independent auditor prepares and delivers, at least annually, a written statement delineating all relationships between the independent auditor and the Company, must actively engage in a dialogue with the independent auditor with respect to any disclosed relationships or services that, in the view of the Committee, may impact the objectivity and independence of the independent auditor, and, if the Committee determines that further inquiry is advisable, must take appropriate action in response to the independent auditor's report to satisfy itself of the auditor's independence.

3. <u>Annual Financial Statements and Annual Audit</u>

*Form 10-K Review.* The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Audit Committee Report.* The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

4. <u>Quarterly Financial Statements</u>

*Form 10-Q Review.* The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

5. <u>Other Duties and Responsibilities</u>

*Complaint Procedures.* The Committee must establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

6. *Related Party Transactions.* The Committee must review all related person transactions as defined by Item 404 of Regulation S-K on an

ongoing basis and all such transactions must be approved or ratified by the Committee.

7. *Review of this Charter.* The Committee must annually review and reassess this Charter and submit any recommended changes to the Board for its consideration.

V. **Delegation of Duties.**

8. In fulfilling its responsibilities, the Committee is entitled to delegate any or all its responsibilities to a subcommittee of the Committee.

(Emphasis in original).

102.    In violation of the Audit Committee Charter, the Audit Committee Defendants (defined below) failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal controls over financial reporting, disclosure controls and procedures, and Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Relevant Background

103.    Expensify operates as an expense management software platform that is designed to help small and medium-sized businesses ("SMBs") "simplify the way they manage money." The Company was originally created to improve the experience of everyday employees' expense management. To this end, Expensify created a cloud-based platform which allows businesses to manage payments, design invoices, and pay bills, among other things.

104.    Expensify touted its product as a self-service platform that was intended could be implemented and configured with Concierge, the Company's artificial intelligence-powered customer support engine. Concierge was supposedly designed to aid new members in setting up their accounts, connecting teammates to each other, assigning company policies and sync Expensify's platform with existing accounting, human resources and travel systems.

105.    By December 2020, businesses with less than 1,000 employees made up over 95% of Expensify's customers by revenue. At that time, these businesses supposedly represented the Company's "largest greenfield opportunity" as of the IPO.

**A.    *Expensify Touts a Subscription-Based Expense Management Platform with Tiered Pricing***

106.    Expensify depicts its expense management service as one platform with tiered pricing that allows access to several features ranging from expense management to bill payment. Through the tiered pricing model, Expensify separates its subscription-based plans into four types: *Track*, *Submit*, *Collect*, and *Control*. The Company maintains that each tier offers users different levels of features that are tailored to each users' needs.

107.    The *Track* plan provides Expensify's SmartScan receipt scanning functionality. SmartScan scans and tracks receipts for various expenses, including flights, hotels, restaurants, and more.

108.    The *Submit* plan offers all of the *Track* plan's capabilities plus the capability to submit expense reports for reimbursement automatically. Likewise, the *Collect* plan mirrored the *Submit* plan, while also providing users with the ability to merge with popular small business accounting systems, configure simple expense report approval workflows, as well as reimburse employees, contractors and volunteers via Direct Deposit ACH. The *Control* plan mirrored the *Collect* plan and also provided users with the ability to configure rules-based approval workflows, and integrate with financial, travel, human resources, and other internal systems often used by mid-market and enterprise companies.

109.    Subscriptions to Expensify's platform are paid by individuals or companies on behalf of themselves, their employees, or contractors. Expensify refers to these paying subscribers as "members." The Company calls any person who pays for themselves a "customer."

These customers are then grouped into one or more "expense policies" which may include an individual, an entire company, or a department of a bigger company. Expensify does not recognize sole proprietors on its *Track* or *Submit* plans as "customers."

**B.  *Expensify Promotes A "Bottom-Up" Business Model***

110.    When Defendant Barrett launched Expensify, the Company touted a viral "bottom-up" business model that largely relied on the Company's reputation and customer satisfaction for continued and future engagement. This approach sought to generate revenue through word-of-mouth marketing by emphasizing Expensify's purportedly user friendly platform.

111.    In reality, the "bottom-up" business model usually began with an individual employee of a company adopting the Company's self-service platform. The individual employee would download the Company's mobile application or sign up—free of charge—via Expensify's website. The employee would then submits expenses to company managers through Expensify's platform. Receipt of an expense report automatically makes the receiver, who oftentimes is a manager, a member. The success of the business model is based on employees who use Expensify realizing the benefits of the Company's platform and vocalizing their support of Expensify internally to other employees. Then, with several employees adopting Exemplify to submit expenses, the manager's job will be simplified and the decision maker within the customer organization will purchase a subscription to Expensify and become a paying customer with a few members.

112.    The Registration Statement listed two "key business metrics" including Expensify's ability to increase the number of paid members on its platform and its non-GAAP revenue. The Company considered "paid members" to include the average number of users (employees, contractors, team members, etc.) who are billed on *Collect* or *Control* plans during

any quarter. If a business, such as an SMB or sole proprietorship, has only one employee, the business owner may be the only paid member.

113.    The Company bills subscription plans monthly with varying rates. *Track* and *Submit* plan subscribers are billed a monthly flat rate if they exceed their twenty-five-scan allotment. In contrast, the *Collect* and *Control* plans give customers the option to be billed at a "pay-per-use" rate with no minimum commitment (a flat rate charged for each active policy member in the previous month) or an "annual" rate that commits the customers to a minimum number of monthly seats for a full calendar year. The annual rate gives the customer a cheaper subscription price as compared to the "pay-per-use" rate, but still requires that an over usage is billed at the "pay-per-use" rate.

114.    For the quarter ended June 30, 2021, 95% of Expensify's revenue came from subscription plans paid via credit cards. The outsized contribution of subscription-based fees makes the Company's propensity to maintain and grow its customer base integral to its financial success. As stated in the Registration Statement, "[o]ur success depends on converting users who try the free aspects of the Expensify platform into paid members. While our viral model means that employees or contractors often introduce Expensify into SMBs, companies subscribe and pay for the majority of our paid members."

115.    The "bottom-up" business model also relied on channel partnerships to increase revenue growth, primarily depending on its accounting partners suggesting Expensify's expense management platform to their clients. Historically, Expensify's accounting channel has contributed 10% of Expensify's revenue.

116.    In the past, Expensify's "bottom-up" business model has produced a steady growth rate, which allowed the Company to save millions of dollars that would have been spent on

advertising had it used a traditional top-down sales and marketing approach to attract and retain customers.

**C.** ***The Negative Effects of Expensify's Decision to Double and in Some Cases Triple, its Per Member Prices***

117.    Unbeknownst to investors, Expensify's "bottom-up" business model began to fail prior to the IPO due to several management decisions that had a severe negative impact on the Company's underlying business. In April 2020, Expensify announced that, effective May 1, 2020, and onward, its per member price would be increasing for the first time since implementing its subscription-based fee model in 2009.

118.    This price increase led to an increase in the per member price for two out of the four subscriptions services provided. The per member price for a *Collect* subscription increased from $5/user/month to $10/user/month for members on an annual rate and $20/user/month for members on a pay-per-use rate. While the per member price for a *Control* subscription increased from $9/user/month to $18/user/month for members on an annual rate and $36/user/month for members on a pay-per-use rate. The cost of the *Track* and *Submit* subscription plans did not change and remained at $4.99/month. At this time, Expensify also revised its annual contract terms to be non-cancelable.

119.    Based on their experience as a sales manager and channel partner for Expensify from June 2020 to April 2023, CW-1 reported that Expensify's decision to double, if not triple, its per member pricing enraged numerous customers and cost the Company subscribers, many of which did not renew their subscription once their contractual commitment expired. The full effect of the price increase was seen during the three-month period from March 31, 2020 to June 30, 2020 ("Q2 2020") when, for the first time since its inception, Expensify saw a decrease in paid

members. During this three-month period, the average number of paid members decreased from 742,000 to 630,000, or a 15.09% decline.

120.    In an effort to manage the clients' reactions to the significant price increase, Expensify offered a 50% discount for members on an annual rate and a 75% discount to members on a pay-per-use rate if they "bundled" with the Expensify Card – *i.e.*, at least 50% of the customer's company expenses must be paid for using an Expensify Card. This allowed Expensify to monetize transactions from the Expensify Card by receiving a percentage of the interchange for all purchases made using the Expensify Card. Although, Expensify customers were hesitant to adopt the Expensify Card. Per the Registration Statement, monetizing Expensify Card activities reduced the Company's cost of revenue by only $0.03 million and $1.0 million for the fiscal years ended in December 31, 2019 and 2020, respectively, and $1.1 million for the six months ended June 30, 2021.

121.    Such a steep price increase may have seemed reasonable if improvements in customer service had been made. However, CW-7, the customer success manager at Expensify from March 2021 to February 2023, did not note of any improvements in customer support following the price increase. In fact, CW-7 reported that Expensify often made unexpected, substantial changes to the process for handling customer accounts, which upset customers and confused and frustrated employees. Additionally, CW-7 reported that shortly after they first began working at Expensify (in March 2021), the role of customer support turned away from providing direct support regarding the onboarding process of Expensify and instead became chaotic and messy.

122.    The negative effects of Expensify's price increase were further amplified by competitors, such as Ramp, Brex, and bill.com (later merged with Divvy), emerging with similar

expense management platforms that did not charge a subscription-based fee. CW-5, the head of sales and enablement at Expensify from July 2014 to September 2023, attributed these negative effects to competitors providing solutions for free, as opposed to requiring a subscription.

123. Together, the Company's May 2020 price increase, followed by the Company's failure to make necessary product improvements to meet customer satisfaction, reduced Expensify's competitive edge in the marketplace, which negatively impacted customer retention and net seat expansion.

**D.** ***Detrimental Effects of Defendant Barrett's Decision to Send Political Spam Mail Via Expensify's Professional Customer Database on the Company's Channels, Customer Base and Employees***

124. Expensify's business was further damaged on October 22, 2020, when Defendant Barrett sent a contentious political email to Expensify's then-current 10 million users concerning the upcoming presidential election. The e-mail was sent via Expensify's professional customer database, entitled "Protect democracy, vote for Biden." Specifically, it stated, in part:

> I know you don't want to hear this from me. And I guarantee I don't want to say it. But we are facing an unprecedented attack on the foundations of democracy itself. If you are a US citizen, **anything less than a vote for Biden is a vote against democracy. …**

**I.    Negative Effects on Channels**

125. Defendant Barrett's email (the "Email") had a severe negative impact on the Company's channels. Expensify's largest retail channel was accountants, who recommended Expensify to their clients for its expense management platform. CW-4, the events marketing and operating lead at Expensify during the "Relevant Period" stated that Expensify's serious efforts to get accountants to suggest the Company's expense management platform quickly diminished following the "Email." CW-4 reported that Expensify's accounting partners found Barrett's

political email especially offensive, significantly straining the relationships between Expensify and the accountants for years.

126.    For example, in October 2020, a retail partner and Expensify customer known as "Travis_W" responded to Defendant Barret's political email stating, in relevant part:

> I have, for years, recommended Expensify as a great platform for managing expenses to clients. I have spent hours and hours of my time getting clients set up and trained to used the platform. Like many other long-time users, I have been less than impressed with many of the recent changes to the platform, while other issues (hello, G/L code with account names?) remain unresolved. Overall it as made the platform more unwieldy to use for managing credit card transactions in an organization. Now, I am going to have to explain to my clients why a vendor thought it would be a good idea to send out a blast email to endorse a particular political candidate 10 or so days before what promises to be an emotional election.
> …
> All that to say is that I will no longer be recommending Expensify to my clients. I am also prepared to have many of my existing clients cancel their service, and I can't say I blame them. Mr. Barrett, while I can respect that you are willing to utilize your First Amendment rights to say what you will on this topic, you forgot to respect your actual customers who don't really care, one way or the other, about your political views.

127.    The Company was still receiving backlash from the "Email" as late as May 2023, despite efforts to mend the strained relationships.

## II.    Negative Effects on Customer Base

128.    Defendant Barrett's email (the "Email") severely harmed Expensify's reputation in the eyes of its customers by isolating a significant portion of the Company's customer base, leaving a number of customers unsatisfied. This led to a decrease in customer retention and revenue growth, which ultimately decreased the efficacy of the Company's word-of-mouth marketing strategy.

129.    CW-1, who worked as a sales manager and channel partner for Expensify from June 2020 to April 2023, described the impact of Defendant Barret's email in reporting it offended

about 5 million of the 10 million recipients, with responses pouring in almost immediately from agitated customers.

130.    The swift response to the email was evident with customers promptly cancelling their service with Expensify. Customer "Portland" said they "cancelled service th[at] morning, sent Barrett an email and reviewed the app strongly," stating that Barrett failed to respect the business and practice of product service providers maintaining an apolitical position and work environment.

131.    In October 2020, client of Expensify, business owner, and recipient of Barrett's email, Ken McKibben, expressed his distaste at the email, stating the email "betray[ed] all trust" and was an "abuse of [his] employee's emails." He went on to say, "[he] never would have imagined when we signed up for the service that the CEO would be so irresponsible and self-absorbed that he would use those emails to promote a specific political candidate" and said it "must never happen again."

132.    Within the same month (October 2020), a second Expensify customer "Darla" expressed her disdain in response to the email by saying, "[f]rankly that is just unacceptable behavior to use your customer database to solicit votes for your personal agenda. In my opinion it doesn't matter who you support, it's just not appropriate to use the platform in that regard. **I pay you for a SERVICE and not to hear your political opinions!** There are other forums to discuss politics and your personal opinions. A customer service forward company should respect its customer more. You've stepped over the line here and frankly that's just uncool!" (emphasis in original).

133.    Other customers, who endorsed the platform by suggesting it to their coworkers, felt responsible for Barret's damaging and unprofessional email, feeling it reflected poorly on

them. This further decreased customer satisfaction. Customer "Julia's", response to the email stated, "[t]his literally just ruined my whole weekend, and there is going to be so much fallout from it. Everyone in my company thinks I had some kind of control over this. I am so embarrassed and just want to crawl in a hole."

134.    CW-6, the accounts payable and payroll administrator during the "Relevant Period" further explained the negative effects of the "email" stating that it not only hurt the business, but also caused Expensify to lose customers in the small and midmarket group.

135.    For example, Charles Hoskinson, founder and CEO of the blockchain infrastructure research and engineering company, IOHK, received the "Email" and confirmed that he (on behalf of his 400+ employees) intended to sever all ties with Expensify in response to Barrett's email.

136.    Additionally, the day after receiving Barrett's email Expensify customer "jcdav" indicated his company would no longer be a customer of Expensify saying "[o]ur company of 120 employees are dropping Expensify. This is sickening."

137.    Likewise, in October 2020, Customer "RJRIley" replied to Barrett's email letting Expensify know he would be acting against Defendant Barrett's political endorsement stating, "[d]oing something about it, over 20 user accounts canceled."

138.    That same month, customer "DCChristopher" cut ties with Expensify by instructing their company administrator to "immediately close out our current expenses and leave Expensify," emphasizing that "[t]his has no place whatsoever in a business environment."

139.    Customer ("WAB") also announced it was severing ties with Expensify in October 2020, stating Expensify could "move forward with one less stream of revenue as our company will be terminating business with them."

140.    In December 2020, customer "KimT" expressed her disdain at the political email and their company's decision to no longer use Expensify in her email response stating, "Barrett violated our company policies with his political solicitation. He upset our employees AND investors. … We are attempting to cancel our subscription but are having difficulty getting a response from Expensify to do this. We were horrified to receive the political email from the CEO of Expensify and want nothing to do with a company such as theirs." Customer "KimT" exclaimed the email was "absolutely insulting and unprofessional," and viewed the email, disappointing customer service, and high pricing of Expensify as enough reason to leave.

141.    Within the same month, another Expensify customer stated "[a]dd us to the list of a rapidly growing companies that will be leaving by the end of Q1 2021" claiming to have "negotiate[d] that timetable back from IMMEDIATELY [with company] leadership back in November."

142.    Shortly after, customer "burbanite" sent a strong response to the political email warning Expensify of the extent of the damage caused by the email stating, "[t]hey seem to think that they mainly lost a small number of non-paying customers. Maybe that is correct but pretty soon they are going to feel the effect when the company I work for dumps them."

### III.        Negative Effects on Expensify Employees

143.    CW-4, the events and marketing lead during the Relevant period, discussed the effects of Defendant David Barrett's email on Expensify employees. She expressed that Barrett's political spam email was seen as a persistent hassle from an employee perspective. Further, CW-1 stated that many employees, including CW-1, felt they have been isolated by the political email. Following the email, employees were advised to "stand behind it," if the email came up and say as little as possible to customers offended by the political spam email. CW-5 expressed similar

frustration when reporting that managing the severe backlash of the email was quite difficult, explicitly stating "you have no idea" in reference to the severity of the email's backlash.

**E.** ***Material Alternation of Expensify's Business Model Due to Spoiled Reputation and Dissatisfied Customer Base***

144.    To counter the negative impact on Expensify's customer retention and seat expansion following the May 2020 price increase and Defendant Barrett's October 2020 political email, the Company instituted a significant shift in marketing strategy that deviated materially from its previous "bottom-up" business model.

145.    Expensify previously relied on its "bottom-up" strategy for marketing its platform, which directly correlated with the Company's primary revenue growth drivers being existing customer retention and net seat expansion.  The Company calculated its gross logo retention rate as of the end of a period by using (a) the amount of distinct companies who have every had 5 or more paid members paying for a subscription during the period ending one year prior as the denominator and (b) the number of those same companies that are still paying for at least 1 subscription during the more recent period as the numerator.

146.    The Company's gross logo retention and net seat retention at the end of the following fiscal years was as follows: at the end of fiscal year 2019 the growth logo retention rate was 88% and the net seat retention rate was 96%; at the end of fiscal year in 2020 the gross logo retention rate was 86% and the net seat retention rate was 96%; and at the end of fiscal year in 2021 the gross logo retention rate was 83% and the net seat retention rate was 93%.

147.    Outside of relying on the Company's "happy customer" model (*i.e.*, "bottom-up strategy"), Expensify's advertising was limited to general brand content. In fact, the Registration Statement explicitly expressed the company's disdain for traditional marketing methods,

emphasizing that these traditional means of generating new user activity were not Expensify's approach to a successful business.

148.    However, due to Expensify's "bottom-up" business model no longer supporting its growth strategy, Expensify made the decision to materially change its business model ***before*** the IPO to a more traditional outbound or go-to-market and sales approach to stimulate growth of its paid members and recover revenue.

149.    CW-2, the business operations specialist and product operations associate during the Relevant Period, reported that when discussing Expensify's financial health during the Company's monthly meetings, Company executives regularly noted that Expensify had reached "DEFCON" status, signaling that the Company was in poor financial health.

150.    Because Expensify's original "bottom-up" business model could no longer support the Company's growth strategy, Expensify decided to materially change the business model to a more traditional outbound or go-to-mark and sales approach to stimulate financial growth ***prior*** to the IPO.

151.    CW-4 states that such changes materialized around March 2021, when Expensify hired 60 sales development representatives ("SDRs") ***before*** the IPO in order for the company to build up its customer base prior to going public.

152.    Additionally, CW-7, who worked as a customer success manager at Expensify from March 2021 to February 2023, noted a shift in the Key Performance Indicator (KPI) from the beginning of her employment, to shortly thereafter. They specifically stated that, in March 2021, the KPI was a specific number of calls per hour – *i.e.*, a focus on efficient and effective support to promote customer retention and expansion – but soon it shifted to the number of people they could get onboarded that month – *i.e.*, new user acquisition on any plan, at any rate.

153.    Additional evidence of new advertising strategies was described by CW-3, who worked as a marketing designer at Expensify from April 2019 to May 2022. CW-3 said there was a big push in new advertising before the IPO, claiming Expensify created an especially large amount of content in the lead-up to the IPO. Further, according to CW3, there was a notable downward shift in demand for brand content after the Company went public, signifying a further departure from its original business model.

154.    The Chart below indicates Expensify's quarterly spend on sales and marketing:

| Quarter Ended | Sales and Marketing (in thousands) |
|---|---|
| March 21, 2019 | $14,662 |
| June 30, 2019 | $6,809 |
| September 30, 2019 | $2,586 |
| December 31, 2019 | $3,131 |
| March 31, 2020 | $3,349 |
| June 30, 2020 | $2,974 |
| September 30, 2021 | $7,608 |
| December 31, 2020 | $2,074 |
| March 31, 2021 | $3,077 |
| June 30, 2022 | $12,244 |
| September 30, 2021 | $7,608 |
| December 31, 2021 | $13,109 |
| March 31, 2022 | $13,372 |
| June 30, 2022 | $12,244 |
| September 30, 2022 | $12,342 |
| December 31, 2022 | $11,918 |
| March 31, 2023 | $9,183 |
| June 30, 2023 | $14,714 |
| September 30, 2023 | $12,860 |
| December 31, 2023 | $7,595 |

155.    The Registration Statement reflects an increase in Expensify's sales and marketing expenses during the first two quarters of 2019 based on an increase in costs associated with its Super Bowl campaign.  After this abnormal advertising expense, the Company went back to its

more traditional "bottom-up" model throughout the second half of 2019, the full fiscal year of 2020, and the first half of 2021.

156.    Its expenses in sales and marketing then doubled in the third quarter of 2021 and then doubled again in the fourth quarter of 2021, around the time the IPO statement was registered.

157.    Investors remained unaware of several business changes in Expensify at the time of the IPO, including the change in business model from "bottom-up" to a more traditional model. Additionally, investors remained unaware that a significant number of paid members were switching to pay-per-use rate subscriptions versus annual rate subscriptions, causing severe volatility in the Company's paid members rates from month-to-month and reducing the sustainability of Expensify's revenue growth.

### F.    *Filing of IPO and Subsequent Events and Disclosures*

158.    On October 15, 2021, Expensify filed an initial registration of new securities on Form S-1 with the SEC, as amended on Form S-1/A and filed on October 18, 2021, November 1, 2021, and November 8, 2021. The SEC declared it effective on November 9, 2021. The Company filed its final prospectus for the IPO on Form 424(b)(4) on November 12, 2021, which was incorporated by reference into the initial registration statements and subsequent amendments. The initial registration statement along with the amendments and the final prospectus comprise the Registration Statement (as previously defined).

159.    In early to mid-November (on or about November 11, 2021), the Company commenced the IPO of Expensify Class A common stock, which was listed on the Nasdaq under the ticket "EXFY." The IPO was comprised of 2,608,696 shares of Class A common stock sold by Expensify, as well as an additional 7,122,080 shares of Class A common stock sold by selling stockholders. Additionally, the option to buy up to 1,459,616 additional shares of Class A common

stock from certain selling stockholders, was given to the Underwriter Defendants pursuant to the Registration Statement.

160.    On November 15, 2021, Expensify announced that it was closing its IPO of 11,190,392 shares of common stock priced at $27.00 per share. This included the shares sold by particular selling stockholders pursuant to the full exercise of the underwriters' option to purchase additional shares.

161.    Expensify's Registration Statement used to conduct its IPO was comprised of false statements of material fact or omissions of material facts required to be stated therein or necessary to make the statements therein not misleading in regards to: the May 2020 price increase; Defendant Barrett's October 2020 political  email encouraging support of a political candidate; and the Company's decision to deviate from its defining "bottom-up" growth strategy. Instead, investors were made aware of these actions, along with their negative effects to the Company, over time through analyst downgrades, as well as admissions and revelations from Expensify.

162.    Morgan Stanley was the first market analyst to shed light on Expensify's bleak future by downgrading Expensify to Underweight from Equal-weight on June 12, 2023. Specifically, it highlighted structural headwinds and the Company's risk-reward profile. Analyst James Faucette of Morgan Stanley stated, "We expect EXFY to face challenges near-term as the core business works through structural and macro-related headwinds, and new product contribution remains highly uncertain." Furthermore, Morgan Stanley cut its estimates for Expensify's 2023/2024 revenue to $163.4M/$175.1M from $183.4M/$203.9M. It also cut its stock price target for Expensify to $5 from $9, implying a 30.3% potential downside to the Company's last close.

163.    Following this news, Expensify's stock price fell $0.45 per share, or 6.28%, to close at $6.72 per share on June 12, 2023.

164.    On August 1, 2023, Expensify's competitor, Ramp, a finance automation platform focused on corporate cards and bill payment, announced that its Ramp Plus expense management SaaS offering will be complementary to all existing SMBs/mid-market customers for one year. Ramp Plus offered similar, if not superior, capabilities to Expensify's expense management platform, providing it with a competitive edge. That same day, another competitor to Expensify's expense management platform and Expensify Card, Brex, the global spend platform, launched Brex payables—an AI- enabled Accounts Payable (AP) solution. This solution combined enhanced bill pay capabilities and controlled purchase cards that offered the flexibility and security of a credit card with the transaction-specific controls required of high-balance spend, also giving it a competitive advantage over Expensify.

165.    On this news, Expensify's stock price fell $1.65 per share, or decreased by 20.47%, to close at $6.41 per share on August 1, 2023.

166.    After the market closed on August 8, 2023, Expensify announced its financial and operating results for the quarter ended June 30, 2023 ("Q2 2023") in a press release. In addition to other highlights, Expensify reported GAAP EPS of -$0.14, missing consensus estimate of - $0.07. Additionally, the press release stated, in relevant part:

**Second Quarter 2023 Highlights**

**Financial:**
- ***Revenue was $38.9 million, a decrease of 10% compared to the same period last year***.
- Utilized $0.4 million cash in operating activities and generated $1.1 million of free cash flow.
- ***Net loss was $11.3 million, compared to $8.0 million for the same period last year.***

- ***Non-GAAP net loss was $1.0 million***.

- Adjusted EBITDA was $2.2 million.

- Interchange derived from the Expensify Card grew to $2.7 million, an increase of 56% compared to the same period last year.

**Business:**

- **Paid members** – ***Paid members were 742,000, a decrease of 2% from the same period last year.***

(Emphasis added).

167.    On August 8, 2023, the Company also hosted an earnings call with investors and analysts where it discussed Expensify's Q2 2023 financial and operating results. When asked, during the Q&A portion of this call, whether the Company intended to reaffirm its previously issued long-term 25%-35% revenue guidance, Defendant Muralidharan replied, in relevant part:

[. . .] I'll say this for a few quarters now, since the day we went public really, we

have not been in sort of normal or stable economic conditions. ***And for a few quarters now, we keep reaffirming that long-term guidance, and we keep getting questions all around and they're fair, when will this long-term guidance actually be true since we haven't been close to the long-term guidance in terms of growth***.

So we actually took all of your feedback and removed it because we just don't know what we don't know. We haven't been in stable condition since 2020 with this or that or the other. Like first there was a pandemic, then there was concerns of the global recession, then there was a global recession. There still is, like I'm fuzzy on the details, but very chaotic.

***So we've removed it and then once we sort of hit stability again, we will be able to reaffirm it, but we don't want to keep giving you outdated long-term guidance, if you will. So that's the reason we took it away.***

(Emphasis added.)

168.    On August 9, 2023, JMP issued an analyst report titled, "Expensify, Inc. (EXFY) 'In a Bit of a Rebuilding Phase' with a GAAP Revenue Down 10% Y/Y; Downgrading to MP." In this report, JMP announced that it was downgrading the Company to Market Perform from Market Outperform for the following reasons:

1) we do not see a clear inflection point for the business within the next year after revenue has shrunk in each of the last two quarters, both year over year and sequentially on a GAAP basis, with the declining top line affecting profitability and cash flow in 2Q; 2) our impression is the company remains in investment mode and is prioritizing the longer-term product roadmap, rather than incremental monetization in an increasingly competitive space, which is unlikely to get public market investors excited in the near term, in our opinion; and 3) the company disclosed that paid member count came in at 719K in July, down from the three-month average of 742K in 2Q.

169.    JMP also brought attention to the fact that, beginning in the three-month period ended September 30, 2021 ("Q3 2021") (a few short weeks before the November 2021 IPO) and continuing through to the present day, Expensify's revenue growth significantly slowed down with growth decreasing from 73% in Q3 2021 to 57% in Q4 2021 (around the time of the November 2021 IPO) to 22% in 2Q22. Revenue growth continued to decrease in 2023.

170.    On August 9, 2023, another analyst report was issued, this time by Loop, titled "Not Working Out Like We Hoped; Downgrade to Hold," in which Loop outlined several primary risks to investment in Expensify. This included risks related to the Company's "pricing strategy to drive adoption of the Expensify Card," the change in Expensify's long-term revenue growth targets, and the Company's "change in the current go-to-market and sales strategies and inconsistent sales execution."

171.    Following this news, Expensify's stock price fell $1.69 per share, or 28.55%, to close at $4.23 per share on August 9, 2023.

172.    On September 15, 2023, J.P. Morgan assigned an "Underweight" rating to Expensify in an analyst report titled, "Attractive fundamentals, but challenging business model; Initiate with Underweight," citing "limited differentiation vs. competitors that aid in easing expense management, bill paying, invoicing, etc." and "challenging revenue mix and distribution

model." When describing the Company's "challenging revenue mix and distribution model" the report stated:

> Much of the EXFY customer acquisition model relies on existing customers spreading the word on EXFY value proposition to more senior officers with decision-making authority. Additionally, EXFY revenue model envisages having almost 1/3 of its revenue being generated from Pay-Per-Use contracts vs. a more predictable annual subscriptions. However, in a challenging macro environment the combination of the above factors lead to lower visibility into revenue trends and adversely impact paying customer growth as companies tighten expenses, while employees favor job security and are therefore not changing jobs as frequently to promote EXFY through the word-of-mouth model.

173.    On this news, Expensify's stock price fell $0.35 per share, or 9.19% to close at $3.46 per share on September 15, 2023.

174.    Eventually, after the market closed on November 7, 2023, Expensify issued a press release announcing its financial and operating results for the third quarter, ending on September 30, 2023 ("Q3 2023"), stating, in relevant part, that:

**Financial:**

- ***Revenue was $36.5 million, a decrease of 14% compared to the same period last year.***

- The Company utilized $5.1 million cash in operating activities.

- Free cash flow was $(7.1) million.

- ***Net loss was $17.0 million, compared to $8.2 million for the same period last year.***

- ***Non-GAAP net loss was $6.7 million.***

- Adjusted EBITDA was $(3.5) million.

- Interchange derived from the Expensify Card grew to $3.1 million, an increase of 65% compared to the same period last year.

- Immediately following the end of the current quarter, the Company deployed $36.0 million of available cash to further reduce outstanding debt by paying off its term loan in full.

**Business:**

- **Paid members** - ***Paid members were 719,000, a decrease of 6% from the same period last year.***

(Emphasis added).

175.    On that very day, Expensify hosted an earnings call with investors and analysts to discuss the Company's Q3 2023 financial and operating results, in which Defendant Schaffer discussed the Company's quarterly revenue results. He stated the following, in relevant part:

> So revenue was $36.5 million, which is a 14% decrease from the same period last year. That's driven by a number of things. One is a decrease in activity and our user base. And Anu [Muralidharan] just spoke about user expansion being one of the biggest growth drivers for Expensify.
>
> ***And in recent periods, we've actually seen the growth expansion decrease, that's in the 12, 13-plus years of the company, that's really only happened twice and once with in COVID and once it's right now. So in the history of the company, generally, our customers once they onboard, they stay and they grow. What we're seeing now is a decrease in activity from our customers, which is causing a headwind to revenue.***

(Emphasis added.)

176.    After this announcement, leading investment bank, Piper Sandler, issued an analyst report on November 7, 2023 titled "Mired in Another Quarter of Execution Missteps; Lowering Estimates, PT of $2." Piper Sandler notably lowered its target price to $2.00 from $4.00 based on "increasing execution risks and lower estimates." This report went on to explain that:

> Q3 revenue declined on a q/q and y/y basis for the third straight quarter to $36.5M, which was the lowest reported level in two years, resulting in a [Free Cash Flow] burn of $7M this quarter. Paid subscriber metrics declined q/q for the third straight quarter, in part exacerbated by an esoteric pricing policy where SMB customers are required to only pay for 'active' users in a given month. The number of active subscribers in a given quarter is roughly one-third of the total installed base.
>
> • **Ninth straight quarter of eroding growth**. Q3 revenue declined 14% y/y to $36.5M on a $2.7M top-line miss, negatively impacted by a 6% y/y decline in paid subscriber metrics (down 23K q/q to 719K paid members) and another double-digit decline in subscription ARPU. EBITDA margin contracted meaningfully to -9.7% (vs. 4-quarter avg: 18.5%).
>
> . . .

> • **Internal missteps exacerbated by external challenges.** Outsized exposure to SMBs and VSBs has led to a number of internal challenges that now appear to be exacerbated by external challenges. Paid subscriber count eroded for the third consecutive quarter driven by one-third of employees being active in a given month (pricing flaw = internal challenge). Additional macro pressures are now resulting in more SMB customers downsizing and in some cases going under (macro headwinds = external challenge).

(Emphasis added.)

177.     On this news, Expensify's stock price fell $1.07 per share, or 36.89%, to close at $1.83 per share on November 8, 2023.

178.     As of the filing date of the initial complaint in the above-captioned action, November 29, 2023, Expensify stock closed at $2.42 per share. Currently, Expensify's stock trades below $2 per share, indicating a nearly ***95% decline*** from its $27 per share IPO price.

### Materially False and Misleading Statements within the Registration Statement

179.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements in the Offering Documents. The Offering Documents failed to disclose, *inter alia*, that: (i) the Company's revenue growth was exponentially susceptible to macroeconomic and structural challenges; (ii) consequently, the Company exaggerated the efficiency of its Expensify's business model and the likelihood of success in meeting the long-term growth projections referenced in the Offering Documents; (iii) due to the foregoing, the Individual Defendants overstated Expensify's post-IPO growth, business, and financial prospects; and (iv) the Company did not maintain adequate internal controls. As a result, Expensify's public statements were materially false and misleading at all relevant times.

180.    In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Expensify to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between May 1, 2023 and May 31, 2023, approximately 504,493 shares of Expensify's common stock were repurchased, costing the Company over $2.9 million.

181.    In further breach of his fiduciary duties, Defendants Barrett, Schaffer, Muralidharan, and Vidal also failed to maintain internal controls while engaging in lucrative insider trading, reaping collective personal profits exceeding $11,905,952.

**A.  *Misstatements Related to May 2020 Price Increase***

182.    When discussing the Company's revenue recognition, the Registration Statement provided, in relevant part, that:

> During 2019, annual subscription customers who wished to terminate their contracts before the end of the term were required to pay the remaining obligation in full plus any fees or penalties set forth in the agreement. In May 2020, we updated our terms of service, which resulted in annual contracts becoming non-cancelable and a pricing change, which led to an increase in the per member price for paid members.
>
> We charge our customers subscription fees for access to our platform based on the number of monthly members and level of service. The contractual price per member is based on either negotiated fees or rates published on our website. Our contracts with our customers include two performance obligations: access to the hosted software service (SaaS), inclusive of all features available within the platform, and related customer support. We account for the SaaS and the support as a combined performance obligation because they have the same pattern of transfer over the same period and are therefore delivered concurrently. We satisfy our performance obligation overtime each month as we provide the SaaS and support services to customers and as such generally recognize revenue monthly based on the number of monthly members and contractual rate per member.

183.    The Registration Statement did not provide actual per member prices for any of the Company's subscriptions, on any rate, from before or after the May 2020 price increase. Additionally, the Registration Statement explicitly advised investors to not rely on the Company's

website, stating that "[t]he information on or accessed through our website is not incorporated in this prospectus or the registration statement of which this prospectus forms a part, and potential investors should not rely on such information in making a decision to purchase our Class A common stock in this offering."

184.    Additionally, the Registration Statement used by Expensify to conduct its IPO contained untrue statements of material fact or refrained from stating material facts required to be stated therein or necessary to make the statements therein not misleading regarding: (1) the May 2020 price increase; (2) Defendant Barrett's October 2020 political spam email; and (3) Expensify's decision to abandon its defining "bottom-up" growth strategy. The truth concerning the effects of these actions and/or decisions emerged over the time as analyst downgrades provided insight into the financial health of the Company and as admissions and revelations from the Company came to light.

185.    The Registration Statement referenced the Company's May 2020 "pricing change" when discussing "revenue" and "quarterly results of operations." Specifically, it stated:

> Revenue increased $24.4 million, or 60%, for the six months ended June 30, 2021 compared to the same period in 2020, ***primarily due to a pricing change*** implemented in May 2020, which led to a gradual increase in per member price ***for our paid members*** from existing customers not using the Expensify Card in connection with our expense management platform for 50% or more of their approved expenses and increased demand for business travel, which is a significant use case for our platform and drove an increase in the number of paid members, due to the lifting of travel restrictions within the United States and certain other countries and increased employers returning to the office as a result of the wide spread availability and distribution of COVID-19 vaccines.
> . . .
> Our revenue in each of the quarters presented predominantly increased consecutively over periods presented primarily due to increased demand for our platform from both new and existing customers as well as an increase in our average paid members and a pricing change implemented in May 2020, which led to a gradual increase in per member price for our paid members from existing customers not using the Expensify Card in connection with our expense management platform for 50% or more of their approved expenses. All new customers beginning on May

1, 2020, were subject to this pricing change. Our revenue was adversely affected by the COVID-19 pandemic in the quarter ended June 30, 2020, particularly due to the decrease in business travel, which is a significant use case for our platform, but this adverse impact was mitigated by the prevalence of our annual contracts and minimum user requirements in those contracts.

(Emphasis added.)

186.    The aforementioned statements included in the Registration Statement were false and materially misleading because they did not disclose how great the "pricing change" and its effects had proven to be, including causing customers to not renew their contracts with Expensify and causing seat expansion rates to slow, halt, and/or decline.  Expensify also doubled and/or tripled its subscription prices in May 2020 and made its contracts non-cancelable. This was not a "gradual" pricing change but instead was implemented on less than 30 days' notice and effective immediately. The harm to customer retention and seat expansion was further exacerbated by competitor products entering the market, some of which were free and therefore became more attractive.

187.    Further, the aforementioned statements were false and materially misleading because they attributed the adverse effects to revenue for the six-month period ended June 30, 2020, solely to a "decrease in business travel" and did not mention how the Company's dramatic price increases announced in April 2020 and made effective as of May 1, 2020, *also materially adversely* affected revenues for the period.

188.    For the first time in the Company's history, Expensify saw a decrease in paid members during the three-month period ended June 30, 2020 – from an average of 742,000 paid members at the period ended March 31, 2020 to an average of 630,000 paid members.

189.    The Registration Statement also mentioned Expensify's May 2020 price increase when discussing potential "risks" faced by the Company. The Registration Statement specifically provided that:

A majority of our subscriptions are driven by bottom-up adoption related to our expense management feature. Although we have added, and expect to continue to add, new features to expand our offerings, and all of our features are accessible under a single subscription, at least in the near term, we expect our expense management feature to continue to drive the majority of our subscriptions. As a result, market acceptance of our expense management feature is critical to our success. Demand for our expense management feature, as well as our other features, is affected by a number of factors, many of which are beyond our control, such as the adoption of our features by new and existing customers; the timing of development and release of upgraded or new features on our platform; products and services introduced or upgraded by our competitors or partners; our ability to determine optimal pricing for our platform, including in international markets; pricing offered by our competitors; technological change; and growth or contraction in our addressable market. ***We recently increased our subscription prices, and we do not know if these price increases will adversely affect our business***. If we are unable to meet customer demand for our expense management feature; do not price our subscriptions optimally or make changes to our subscription or pricing models that are not accepted by the market; or fail to convert members of our free expense management feature or trial subscriptions to paying subscribers, our business, results of operations, financial condition and growth prospects will suffer.

…

We have in the past, and may in the future, need to change our pricing model from time to time. As the market for our platform matures, or as competitors introduce new solutions that compete with ours, we may be unable to attract new customers at the same prices or based on the same pricing models that we have used historically. While we do and will attempt to set prices based on our prior experiences and customer feedback, our assessments may not be accurate and we could be underpricing or overpricing our platform. In addition, if the offerings on our platform change, then we may need to revise our pricing strategies. Any such changes to our pricing strategies or our ability to efficiently price our offerings could adversely affect our business, operating results and financial condition. ***Pricing pressures and decisions could result in reduced sales, reduced margins, losses or the failure of our platform to achieve or maintain more widespread market acceptance, any of which could negatively impact our overall business, operating results and financial condition***. Moreover, the organizations which we target may demand substantial price concessions. As a result, we may be required

to price below our targets in the future, which could adversely affect our revenue, profitability, cash flows and financial condition.

190.    The preceding statements were false and/or materially misleading because they failed to state that Expensify had already begun losing customers due to the May 2020 price increase negatively impacting customer retention and net seat expansion. Thus, at the time of the IPO, Expensify had already failed to price its subscriptions optimally, these prices had already negatively affected Expensify's business, and the Company was already falling short of its goal to convert customers using free subscription plans to its paid plans. These adverse outcomes were not mere hypothetical statements, but in fact materialized consequences.

**B.  *Misstatements Related to Defendant Barrett's October 2020 Political Email***

191.    The Registration Statement made clear that the success of the "bottom-up" business model Expensify claimed to embrace depended squarely on the Company's reputation and brand among its customers. Specifically, it provided that:

> Our intense focus on improving the everyday experience of regular employees with an easy-to-use but powerful platform has enabled a viral, "bottom-up" business model that is capital efficient and extremely scalable. By allowing people to spend less time managing receipts and more time pursuing their real goals, our users (who we refer to as members) have adopted, championed and spread Expensify to their colleagues, managers and friends. We believe our happy members are the best form of marketing and our self-service, bottom-up approach takes advantage of strong, organic word-of-mouth adoption. Underlying our platform is a secure, scalable and defensible technology and user-centric legal foundation that supports and fuels our viral growth. The combination of these factors has allowed us to avoid the costly pitfalls of traditional, top-down enterprise sales and marketing methods that focus solely on decision makers, and invest our time and resources on making features our members love. This has created a massive, untapped and growing market opportunity for us that we believe we are in prime position to capture.

> …

> We believe we address a massive market opportunity today that is significantly underpenetrated by modern solutions. We estimate our total addressable market ("TAM") was approximately $16.0 billion in the United States and $21.5 billion in our core geographies in 2020, which consisted of the United States, United

Kingdom, Canada and Australia in 2020. To estimate our TAM in the United States, we identified the number of employees at SMBs with less than 1,000 employees based on data from the U.S. Bureau of Labor Statistics and segmented these companies into three cohorts based on number of employees: (1) companies with 1-9 employees, (2) companies with 10-499 employees, and (3) companies with 500-999 employees. We then multiplied the total number of employees in each cohort by our average revenue per paid member in each such cohort as of June 30, 2021. . . .

We believe we are able to monetize approximately three times the amount of average revenue per user ("ARPU") in our target market of SMBs compared to some of our enterprise competitors' list prices. In addition to being able to monetize SMBs at a higher ARPU in comparison to enterprise competitors, SMBs by nature tend to grow at a faster rate than enterprises.

192.    Further, in the Registration Statement Expensify represented its "business model" as "a viral 'bottom-up' business model that is capital efficient and extremely scalable. The adoption of Expensify within an organization often starts with the individual employee, who downloads our mobile application or signs up on our website for free and uses it to easily submit expenses to their manager with a few taps. After the employee realizes the benefits of our platform, they become a champion of Expensify and often spread it internally to other employees. With multiple employees using Expensify and valuable features simplifying the manager's job, the decision maker purchases a subscription to Expensify and becomes a paying customer with a few members."

193.    The statements in the foregoing paragraph were materially misleading because they presented Expensify's business model as allowing the Company to tap into a $16 billion total addressable market, yet did not disclose Defendant Barrett's October 2020 political email, which irreparably damaged Expensify's ability to execute on its traditional "bottom-up" growth strategy. This led investors reviewing the Registration Statement to believe that Expensify's traditional growth strategy was proving to be successful, despite the statements within the Registration Statement no longer being accurate and thus not true when the IPO was commenced.

194.    The importance of Expensify's "reputation" and "brand" amongst its customer base was also emphasized in the Registration Statement. Specifically, it stated:

> While we have designed our platform and features to be easy to adopt and use, once individuals and organizations begin using Expensify, they rely on our support services to resolve any related issues. High-quality member and customer education and customer experience have been key to the adoption of our platform and features and for the conversion of individuals and organizations using our free features and trial subscriptions into paying customers. The importance of high-quality customer experience will increase as we expand our business and pursue new customers. For instance, if we do not help organizations on our platform quickly resolve issues and provide effective ongoing member experience at the individual and organizational levels, our ability to convert organizations on our trial subscription into paying customers will suffer, and our reputation with existing or potential customers will be harmed. Further, the success of our "bottom up" business model is highly dependent on our business reputation and on word-of-mouth positive recommendations from existing individuals and organizations using our platform and features. Any failure to maintain high-quality customer experience, or a market perception that we do not maintain high-quality customer experience, could harm our reputation, our ability to sell our platform to existing and prospective customers and our business, results of operations and financial condition.
> …
>
> We believe that the brand identity that we have developed has significantly contributed to the success of our business. We also believe that maintaining and enhancing the "Expensify" brand is critical to expanding our customer base and establishing and maintaining relationships with partners. ***Successful promotion of our brand will depend largely on the effectiveness of our marketing efforts, our ability to ensure that our platform remains high-quality, reliable, useful and competitively priced, the quality and perceived value of our platform, our ability to successfully differentiate our platform and features from those of our competitors and the ability of our customers to achieve successful results by using our platform and features***. Maintaining and enhancing our brand may require us to make substantial investments not just in our core expense management service but also in newer features, such as our travel concierge services, and to make substantial investments in foreign markets, and these investments may not be successful. We also plan to enhance our brand and drive interest in our overall platform by introducing certain consumer-focused features, which may not be successful. Substantial advertising expenditures may be required to maintain and enhance our brand, which may not prove successful. Advertising and other brand promotion activities may not generate customer awareness or increase revenue, and even if they do, any increase in revenue may not offset the expenses we incur in building our brand. Additionally, ***there could be a negative reaction to certain advertising campaigns and values-based activity and communications***. If we fail to promote

and maintain the "Expensify" brand, or if we incur excessive expenses in this effort, we may fail to attract or retain customers necessary to realize a sufficient return on our brand-building efforts or to achieve the widespread brand awareness that is critical for broad customer adoption of our platform and features. We anticipate that, as our market becomes increasingly competitive, maintaining and enhancing our brand may become more difficult and expensive.

(Emphasis added.)

195.    The aforementioned statements were false and/or misleading because they failed to address that the Company's "reputation," "market perception," "brand", relationships to Expensify's channel partners, and impression on its customers had already suffered irreparable harm by Defendant's Barret's political email sent in October 2020. Such irreparable harm had made the company's implementation of its proposed "bottom-up" business model no longer effective, which was in no way made apparent within the Registration Statement. Due to these issues, Expensify had already failed to maintain a high-quality customer experience and had already suffered severe damage to its reputation and brand among its customer base.

C. *Misstatements Regarding Changes to Expensify's Business Model*

196.    The Registration Statement touted Expensify's "bottom-up" business model as one that had saved the Company millions of dollars in advertising expenses, and was more efficient than the traditional marketing approach, stating that:

> *Our intense focus on improving the everyday experience of regular employees with an easy-to-use but powerful platform has enabled a viral, "bottom-up" business model that is capital efficient and extremely scalable*. By allowing people to spend less time managing receipts and more time pursuing their real goals, our users (who we refer to as members) have adopted, championed, and spread Expensify to their colleagues, managers and friends. *We believe our happy members are the best form of marketing and our self-service, bottom-up approach takes a d v a n t a g e o f s t r o n g , organic word-of-mouth adoption.* Underlying our platform is a secure, scalable and defensible technology and user-centric legal foundation that supports and fuels our viral growth. *The combination of these factors has allowed us to avoid the costly pitfalls of traditional, top-down enterprise sales and marketing methods that focus solely on decision makers and invest our time and resources on making features our members love.* This has

created a massive, untapped and growing market opportunity for us that we believe we are in prime position to capture.

. . .

• ***Viral, bottom-up business model driven by the employee.*** Our employee-focused platform strategy enables a viral, "bottom-up" adoption cycle that starts with an individual employee. After signing up for free on the website or downloading our free app to submit expenses and realizing the benefits of using Expensify, our enthusiastic members champion our platform internally, spreading it via word-of-mouth to other employees and convincing decision makers to adopt Expensify company-wide. This enables us to focus our time and resources on making our features better for our members, and avoid the reliance on a costly, traditional top-down sales and marketing approach to attract and retain customers.

• ***Word-of-mouth adoption supported by a market consensus approach.*** We believe that our happy members are the best form of marketing. We strive to build a superior platform that makes the lives of employees and admins easier so that they become our champions and promote us to other individuals and organizations. We deploy large scale brand advertising to build on this platform superiority and help create market consensus that Expensify is the category leader for expense management software. We believe this enables us to focus on creating great features for our members rather than rely on the expensive and ineffective activities of traditional sales and marketing to drive customer acquisition.

. . .

***We also leverage partnerships with accounting and bookkeeping firms, who provide validation of our platform and refer customers to us.*** We partner with strategic accounting software partners such as Intuit, NetSuite, Xero and Intacct to integrate our software in their clients' back offices and recognize us as a top expense tool when their clients are browsing and selecting integrated solutions. Additionally, our *ExpensifyApproved!* Partner Program trains and supports accountants to use our platform and encourages their customers to use Expensify. We work hard to maintain top expense partner status with all partners to support our market consensus strategy. The strength of our alliances is highlighted by frequent distinction by our partners, including being named NetSuite's Innovation Partner of the Year, Xero's App Partner of the Year and one of the most reviewed "Popular Apps" on the Intuit Quickbooks platform.

***We believe that our frictionless, viral and bottom-up business model and word-of-mouth adoption allows us to not rely on traditional outbound marketing efforts that are costly and often ineffective.*** As a result, we can dedicate our energy and resources on strengthening our brand, improving our features and making it easier for more people to adopt Expensify.

. . .

*The traditional approach for software sales has historically been "top-down," whereby software providers deploy costly, targeted ads and a legion of sales representatives focused on selling large, multi-year deals with vague product specifications to decision makers and business owners*. These solutions are specified, deployed and configured by siloed IT departments with little-to-no input from the main consumers of business software: everyday employees. This type of approach poses key challenges for traditional software providers, including:

• *High cost of sale. The traditional top-down approach relies on an army of salespeople to sell, retain and upsell decision makers, requiring an ever-increasing pipeline of sales talent. This makes finding, recruiting and retaining sales talent a significant bottleneck for growth and results in a very high cost of sale -- and more importantly, limits growth to the small corner of the market that can sustain that high cost of sale*.

. . .

• **Viral, bottom-up business model**. *We leverage an efficient, self-service business model driven by the viral, bottom-up adoption of our platform by employees.* After the initial use of Expensify by employees, they realize time savings and improved productivity and recommend our platform to other colleagues and departments within their organization. *Unlike the costly traditional enterprise sales method that focuses on a smaller set of decision makers, our intense focus on the employee enables zero marginal costs for new leads, provides hundreds of entry points into every customer*, and allows us to profitably sell to large portions of the market, from one-person businesses to the largest organizations in the world.

• **Recognized market consensus and efficient word-of-mouth**. *Our members drive the adoption and expansion of Expensify within organizations, and our platform and business model are intensely focused on improving their everyday experience. This creates positive and powerful word-of-mouth that drives incredibly efficient and scalable organic customer acquisition and marketing.* Every employee in every company in the world is a legitimate prospect to us, and since employees greatly outnumber managers in every business, we do not have to laser target our marketing to narrowly qualified decision makers. This means that we have access to exponentially more advertising inventory than traditional top-down sales models and a massive opportunity to create awareness.

. . .

We believe that these strengths set us apart from our competition and put us in a powerful position to maintain and expand our market leadership as we add new features, and our industry grows.

(Emphasis added.)

197.    The preceding statements were false and misleading because at the time they were made, the Company had already begun transitioning from the "bottom-up" business model it prided itself on to a traditional top-down marketing strategy to remedy the harmful effects of Expensify's previous business decisions described above. Upon commencement of the IPO, the Company's "happy members" could ***not*** serve as the ideal form of marketing presumed by Expensify because they were ***not*** satisfied and ***not*** happy following Expensify's May 2020 price increase. Further, the Company's failure to remedy the situation by implementing new or improved platform features led to customer frustration that was further exacerbated by the political email sent out by Defendant David Barrett in October 2020. Based on clear evidence of customer dissatisfaction, the Company's organic word-of-mouth adoption was, in fact, ***not*** "strong" and therefore, its self-service, bottom-up approach did not lead to expected financial growth and success for the Company. As such, there had already been significant material changes to Expensify's business model. Thus the benefits of its originally proposed "bottom-up" marketing strategy, including circumventing costly pitfalls of a traditional marketing approach, which would allow for more time to make or improve features suggested by customers, did not materialize.

198.    The Registration Statement included a section focused on "Recent Developments" in which it provided preliminary consolidated financial results for the fiscal quarter ended September 30, 2021, including:

*Revenue*

Our preliminary estimated revenue is expected to be between $36.6 million and $37.6 million for the fiscal quarter ended September 30, 2021, which represents a range of ***increase of approximately $14.9 million to $15.9 million compared to the fiscal quarter ended September 30, 2020, which was due to an increase in paid members***.

. . .

*Paid members*

Our preliminary estimated number of average paid members as of September 30, 2021, are expected to be between 660,000 and 670,000, an increase of 21,000 to 31,000 from our average paid members as of June 30, 2021 and an increase of 27,000 to 37,000 from our average paid members as of September 30, 2020. ***Our preliminary estimated number of average paid members increased due to improving economic business conditions and our increased investments in sales and marketing.***

(Emphasis added.)

199.    The aforementioned statements were false and materially misleading because they did not mention the following: (i) the Company's increase in paid members and resulting revenue increase were due to a material change in the Company's business model leading up to the IPO; (ii) the Company's paid member rates from month-to-month were experiencing significant volatility due to paid members shifting from annual plans to pay-per-use plans; and (iii) the overall negative impact on the sustainability of the Company's revenue growth.

200.    In its Registration Statement, Expensify listed "Investing to Maintain Market Consensus", as a "key factor affecting our performance", specifically stating that:

Our viral and word-of-mouth adoption model is effective in part because we have established ourselves as a recognized leader in expense management for SMBs. We deploy large scale brand advertising to promote our platform superiority and create market consensus that Expensify is the category leader for expense management software. We believe this enables us to focus on creating great viral features for our members rather than relying on low-margin, unscalable activities of traditional sales and marketing to drive customer acquisition.

(Emphasis added.)

***The Offering Documents in General***

201.    Defendants Barrett, Schaffer, Bartlett, and Lent reviewed and signed the Offering Documents. Defendant Barrett personally wrote and signed a letter that was included inside the Offering Documents ("The IPO Letter"). In providing an overview of Expensify, Defendant Barrett stated in the IPO Letter the following, in relevant part:

69

Expensify is a cloud-based expense management software platform that helps the smallest to the largest businesses simplify the way they manage money. Every day, people from all walks of life in organizations around the world use Expensify to scan and reimburse receipts from flights, hotels, coffee shops, office supplies and ride shares. Since our founding in 2008, we have added over 10 million members to our community and processed and automated over 1.1 billion expense transactions on our platform, freeing people to spend less time managing expenses and more time doing the things they love. For the quarter ended June 30, 2021, an average of 639,000 paid members across 53,000 companies and over 200 countries and territories used Expensify to make money easy.

* * *

We believe that our unique approach has created a highly scalable and efficient business model. We have experienced rapid growth in recent periods. Our revenue was $80.5 million and $88.1 million in the years ended December 31, 2019 and 2020, respectively. Our net income (loss) was $1.2 million and $(1.7) million in the years ended December 31, 2019 and 2020, respectively. Our adjusted EBITDA was $7.6 million and $26.8 million in the years ended December 31, 2019 and 2020, respectively. For the six months ended June 30, 2020 and 2021, our revenue was $40.6 million and $65.0 million, respectively. Our net income was $3.5 million and $14.7 million in the six months ended June 30, 2020 and 2021, respectively. Our adjusted EBITDA was $9.2 million and $22.9 million in the six months ended June 30, 2020 and 2021, respectively. See the section titled "Management's discussion and analysis of financial condition and results of operations" for additional information on our non-GAAP metrics.

202.    The Offering Documents discussed the Company's approach to expense management and how Expensify's business model was the alleged key to the Company's competitive advantage. In discussing this approach, the Offering Documents stated, in relevant part:

Since our founding, we have taken a unique approach to expense management built on key, complementary elements:

- ***Platform strategy hyper-focused on the employee.*** We designed Expensify to be easily configured and used by every single employee within an organization, not just decision makers or managers.

- ***Viral, bottom-up business model driven by the employee.*** Our employee-focused platform strategy enables a viral, "bottom-up" adoption cycle that starts with an individual employee. After signing up for free on the website or downloading our free app to submit expenses and realizing the benefits

of using Expensify, our enthusiastic members champion our platform internally, spreading it via word-of-mouth to other employees and convincing decision makers to adopt Expensify company-wide.

- ***Word-of-mouth adoption supported by a market consensus approach.*** We believe that our happy members are the best form of marketing. We strive to build a superior platform that makes the lives of employees and admins easier so that they become our champions and promote us to other individuals and organizations. We deploy large scale brand advertising to build on this platform superiority and help create market consensus that Expensify is the category leader for expense management software.

- ***Unique company culture and long-term vision.*** Our platform strategy and business model are complemented by our unique company culture and intense focus on the long-term happiness of our employees.
  We believe that these elements of our approach are hard to replicate, self-reinforcing and work together to drive a powerful competitive advantage.

(Emphasis in original).

203.    The Offering Documents further discussed the Company's business model, which

stated, in relevant part:

Our platform strategy enables a viral "bottom-up" business model that is capital efficient and extremely scalable. Anyone can easily download our mobile application or go to our website to sign up for free on their own, and later upgrade to a paid subscription for advanced features. The adoption of Expensify within an organization often starts with the individual employee, who downloads our mobile application or signs up on our website for free and uses it to easily submit expenses to their manager with a few taps. After the employee realizes the benefits of our platform, they become a champion of Expensify and often spread it internally to other employees. With multiple employees using Expensify and valuable features simplifying the manager's job, the decision maker purchases a subscription to Expensify and becomes a paying customer with a few members. Our usage within an organization expands further as the company adds members and adopts new features such as the Expensify Card or Bill Pay. As of June 30, 2021, 60% of our revenue can be attributed to an instance where an employee used our application first and recommended it to their manager.

We offer simple, transparent and flexible subscription plans for both individuals and businesses that are completely self-service and payable by credit card. In the quarter ended June 30, 2021, 95% of our revenue came from recurring, automated monthly payments made via credit cards. We designed our pricing plans to facilitate the easy adoption of our platform by the smallest mom-and-pop stores to the largest and most complex organizations.

We believe that our happy members are the best form of marketing, and our self-service, bottom-up approach takes advantage of strong, organic word-of-mouth adoption. We support this powerful word-of-mouth marketing with large-scale brand advertising to build market consensus that Expensify is the software of choice for expense management.

We believe that our frictionless, viral and bottom-up business model and word-of-mouth adoption allows us to not rely on traditional outbound marketing efforts that are costly and often ineffective. As a result, we can dedicate our energy and resources on strengthening our brand, improving our features and making it easier for more people to adopt Expensify.

204.    Regarding the Company's competitive strengths, the Offering Documents stated,

in relevant part:

We believe our platform strategy, business model, and culture provide us with competitive strengths that will allow us to maintain our position as a category leader for expense management and extend our leadership to improving other back-office functions.

- **Hyper-focus on an improved experience for our members.** Since our inception, our principal goal has been to offer a single, intuitive and powerful platform with features designed for the actual end users of expense management software: everyday employees.

- **Viral, bottom-up business model.** We leverage an efficient, self-service business model driven by the viral, bottom-up adoption of our platform by employees.

- **Recognized market consensus and efficient word-of-mouth.** Our members drive the adoption and expansion of Expensify within organizations, and our platform and business model are intensely focused on improving their everyday experience.

- **Employee-centric legal structure and database design.** Our platform is built on Bedrock, a proprietary and private distributed database that enables us to consolidate all members into a single database and maintain a direct legal relationship with each of them, where they own all their underlying data and control their account status. This non-partitioned, employee-owned account design underpins our success with bottom-up adoption.

- **Nimble and extremely loyal team with a shared, long-term vision.** Our efficient business model allows us to prioritize our resources to attract, retain and inspire a vastly more talent-dense team than our competition. We

have achieved impressive levels of retention, which provides the necessary corporate patience and ambition to execute a truly massive, long-term vision.

(Emphasis in original).

205.    Regarding Expensify's growth strategies, the Offering Documents stated the following, in relevant part:

We intend to drive the growth of our business by executing on the following strategies:

- ***Build new features that create additional value for existing members.*** Our word-of-mouth model works well because people genuinely enjoy using Expensify. We intend to continue to invest in building features that increase the value our software delivers to our existing members. Our flat, generalist and democratic structure cultivates a diversity of ideas from every single one of our employees, which enables an efficient, scalable and rigorous product development process. In the month of June 2021, 70% of our team was involved in material aspects of research and development. By efficiently investing in new features that prioritize the needs of our members, we can continue to retain existing members and attract new members via word-of-mouth;

- ***Build new features that attract new members beyond employees who submit expenses.*** We have and will continue to invest in developing features complementary and adjacent to expense management. At most companies, not every employee generates expenses that would be submitted via an expense report. As we add additional features that can be used by all employees rather than just those that submit expense reports, we have the potential to monetize the segment of our customers' employees that are not submitting expense reports on a monthly basis and increase revenue without adding more customers or raising prices. These features will enable easy financial collaboration within communities and between friends and family;

- ***Build viral loops into our member experience that increase adoption by new customers.*** We design our expense management platform and every new feature with the aim of frictionless adoption. For the six months ended June 30, 2021, approximately 60% of our revenue was driven by bottom-up adoption: individual employees download the Expensify mobile app or sign up on our website, for free, and use it to submit their expenses to their bosses – turning every expense report into a highly targeted marketing message, straight to a decision maker. Outside of expense management, we have expanded our platform and built invoicing and bill payment features with the goal of replicating the frictionless adoption of our expense management feature. By sending an invoice using Expensify, accounts receivable

departments naturally promote Expensify to their clients. A company that adopts Expensify bill payment tacitly promotes Expensify to all of their vendors: any one vendor that sends a manual invoice receives an email notifying them that their invoice was converted into an Expensify invoice, and they should sign in to collect payment online. We will continue to focus on the maintaining and extending the virality of our features to support our viral, bottom-up business model;

- ***Expand and monetize transaction volume from existing and new customers.*** We fully launched the Expensify Card in 2020 and, despite pullback in corporate expenses with the COVID-19 pandemic, customers have begun to adopt the card. We expect its adoption to continue to grow, especially as business travel is expected to return from the challenges caused by the COVID-19 pandemic. Going forward, we intend to increase the promotion of the Expensify Card to both new and existing customers to drive growth in adoption;

- ***Promote Expensify's culture and values***. We believe that consumers are more likely to both use and recommend products from brands they admire. According to a proprietary research study conducted by Havas Group in 2019, 77% of consumers prefer to buy from companies who share their values. By consistently acting on and vocally promoting our values, we have the ability to both drive positive change and create brand awareness that can add to the virality of our platform. Our culture and values, including our adherence to Environmental, Social, and Governance (ESG) principles, will be shared in our company code of ethics and conduct and in future sustainability reporting;

- ***Continue to strengthen our market consensus.*** We have worked hard to establish and maintain Expensify as the dominant expense management platform for SMBs. We leverage a variety of targeted marketing strategies that involve industry conferences, industry influencers, partner marketing, our own conference and more to achieve market consensus that Expensify is the premier, industry standard expense management platform. This is essential to our viral and word-of-mouth business model. We plan to reinforce the market consensus surrounding our platform, as well as expand on these strategies across new feature verticals and markets;

- ***Expand integrations and strengthen partnerships.*** Expense management touches many functions across a company. To provide a seamless experience for our customers, we integrate with the accounting, ERP and travel software used by SMBs and their employees every day. We also have frictionless integrations with many of the technology providers that generate the most receipts for our members, such as Uber and Lyft. Through our *ExpensifyApproved!* Partner Program, we train and support accountants who then encourage their customers to use Expensify. We intend to

continue to invest in both integrations and partnerships as they are critical to delivering best-in-class user experiences and ensuring that Expensify is deeply embedded within our customer base; and

- **_Expand internationally._** For the year ended December 31, 2020, and six months ended June 30, 2021, we derived 10% and 11% of our revenue, respectively, from customers outside the United States, and we see significant opportunity to acquire new customers internationally. Because word-of-mouth drives significant adoption, we have experienced member growth outside of our core geographies without investment in marketing or regional sales forces. We have the opportunity to accelerate international growth by investing in marketing, developing a localized platform experience and expanding international partnership and integrations.

We believe that the combination of the strength of our platform, our scalable business model and our special company culture has us well-positioned to achieve these growth strategies.

(Emphasis in original).

206.    The aforementioned statements referenced in ¶¶ 182-185, 189, 191-192, 194, 196, 198, and 200-205 were materially false and misleading because they failed to disclose, *inter alia*, that: (i) the Company's revenue growth was exponentially susceptible to macroeconomic and structural challenges; (ii) consequently, the Company exaggerated the efficiency of Expensify's business model and the likelihood of success in meeting the long-term growth projections referenced in the Offering Documents; (iii) due to the foregoing, the Individual Defendants overstated Expensify's post-IPO growth, business, and financial prospects; and (iv) the Company did not maintain adequate internal controls. As a result, Expensify's public statements were materially false and misleading at all relevant times.

### The 2022 Proxy Statement

207.    On April 29, 2022, Expensify filed a proxy statement on Schedule 14A filed with the SEC (the "2022 Proxy Statement") notifying shareholders of the 2022 Annual Meeting of Stockholders, to be held on June 22, 2022. Defendants Barrett, Schaffer, Muralidharan, Mills,

Vidal, Christen, Pao, and Liu solicited the 2022 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

208. The 2022 Proxy Statement called for shareholder approval of, *inter alia*: (1) the re-election of Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu to the Board; and (2) the ratification of the appointment of Ernst & Young LLP as the independent registered public accounting firm for Fiscal Year 2022.

209. Regarding the Company's Code of Conduct, the 2022 Proxy Statement provided, in relevant part:

> We have adopted a written code of ethics and conduct that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. A copy of the code is available on our investor relations website at investors.expensify.com. In addition, we intend to post on our investor relations website all disclosures that are required by law or the listing standards concerning any amendments to, or waivers from, any provision of the code. The information on or accessed through our website is deemed not to be incorporated in or part of this Proxy Statement or any other document filed with or furnished to the SEC.

210. Regarding the Board's role in "Risk Oversight," the 2022 Proxy Statement provided, in relevant part:

> Our Board of Directors is responsible for overseeing our risk management process. Our Board of Directors focuses on our general risk management strategy, the most significant risks facing us, our material environmental, social and governance ("ESG") risks and oversees the implementation of risk mitigation strategies by management. Our Board of Directors is also apprised of particular risk management matters in connection with its general oversight and approval of corporate matters and significant transactions.

211. Regarding the Audit Committee's responsibilities, the 2022 Proxy Statement provided, in relevant part:

> Our Audit Committee is responsible for, among other things:
>
> - appointing, compensating, retaining, evaluating, terminating and overseeing our independent registered public accounting firm;

- discussing with our independent registered public accounting firm its independence from management;

- reviewing with our independent registered public accounting firm the scope and results of their audit;

- approving all audit and permissible non-audit services to be performed by our independent registered public accounting firm;

- overseeing the financial reporting process and discussing with management and our independent registered public accounting firm the interim and annual financial statements that we file with the SEC;

- reviewing and monitoring our accounting principles, accounting policies, financial and accounting controls and compliance with legal and regulatory requirements;

- reviewing our policies on risk assessment and risk management;

- reviewing related party transactions; and

- establishing procedures for the confidential anonymous submission of concerns regarding questionable accounting, internal controls or auditing matters.

Our Audit Committee consists of Mr. Christen, Ms. Liu and Ms. Pao, with Mr. Christen serving as chair. Rule 10A-3 of the Exchange Act and Nasdaq rules require that our Audit Committee be composed entirely of independent members. Our Executive Committee on behalf of our Board of Directors has affirmatively determined that Mr. Christen, Ms. Liu and Ms. Pao each meet the definition of "independent director" for purposes of serving on the audit committee under Rule 10A-3 and Nasdaq rules. Each member of our Audit Committee meets the financial literacy requirements of Nasdaq listing standards. In addition, our Executive Committee on behalf of our Board of Directors has determined that Mr. Christen qualifies as an "audit committee financial expert," as such term is defined in Item 407(d)(5) of Regulation S-K. Our Audit Committee operates under a written charter which satisfies the applicable listing standards of Nasdaq and which is available on our website at investors.expensify.com.

212. Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (i) the Company's revenue growth was exponentially susceptible to macroeconomic and structural challenges; (ii) consequently, the Company exaggerated the efficiency of Expensify's business

model and the likelihood of success in meeting the long-term growth projections referenced in the Offering Documents; (iii) due to the foregoing, the Individual Defendants overstated Expensify's post-IPO growth, business, and financial prospects; and (iv) the Company did not maintain adequate internal controls. As a result, Expensify's public statements were materially false and misleading at all relevant times.

213.    The 2022 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as the Individual Defendants violated the Code of Conduct, including by allowing false and misleading statements to be issued to the investing public.

214.    As a result of Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu to the Board, allowing them to continue to breach their fiduciary duties to the Company; and (2) ratify the appointment of Ernst & Young LLP as the Company's independent public accountants for the Fiscal Year 2022.

### The 2023 Proxy Statement

215.    On April 28, 2023, Expensify filed the 2023 Proxy Statement notifying shareholders of the 2023 Annual Meeting of Stockholders, to be held on June 21, 2023. Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu solicited the 2023 Proxy statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

216.    The 2023 Proxy Statement called for shareholder approval of, *inter alia*: (1) the re-election of Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu to the

Board; (2) ratification of the appointment of Ernst & Young LLP as the independent registered public accounting firm for the fiscal year ending on December 31, 2023 (the "Fiscal Year 2023"); and (3) the advisory vote on the frequency of future advisory votes on the compensation of the Company's named executive officers.

217.    Regarding the Company's Code of Conduct, the 2023 Proxy Statement provided, in relevant part:

> We have adopted a written code of ethics and conduct that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. A copy of the code is available on our investor relations website at investors.expensify.com. In addition, we intend to post on our investor relations website all disclosures that are required by law or the listing standards concerning any amendments to, or waivers from, any provision of the code. The information on or accessed through our website is deemed not to be incorporated in or part of this Proxy Statement or any other document filed with or furnished to the SEC.

218.    Regarding the Board's role in "Risk Oversight," the 2023 Proxy Statement provided, in relevant part:

> Our Board of Directors is responsible for overseeing our risk management process. Our Board of Directors focuses on our general risk management strategy, the most significant risks facing us, our material environmental, social and governance ("ESG") risks and oversees the implementation of risk mitigation strategies by management. Our Board of Directors is also apprised of particular risk management matters in connection with its general oversight and approval of corporate matters and significant transactions.

219.    Regarding the Audit Committee's responsibilities, the 2023 Proxy Statement provided, in relevant part:

> Our Audit Committee is responsible for, among other things:
>
> - appointing, compensating, retaining, evaluating, terminating and overseeing our independent registered public accounting firm;
>
> - discussing with our independent registered public accounting firm its independence from management;

- reviewing with our independent registered public accounting firm the scope and results of their audit;

- approving all audit and permissible non-audit services to be performed by our independent registered public accounting firm;

- overseeing the financial reporting process and discussing with management and our independent registered public accounting firm the interim and annual financial statements that we file with the SEC;

- reviewing and monitoring our accounting principles, accounting policies, financial and accounting controls and compliance with legal and regulatory requirements;

- reviewing our policies on risk assessment and risk management;

- reviewing related party transactions; and

- establishing procedures for the confidential anonymous submission of concerns regarding questionable accounting, internal controls or auditing matters.

Our Audit Committee consists of Mr. Christen, Ms. Liu and Ms. Pao, with Mr. Christen serving as chair. Rule 10A-3 of the Exchange Act and Nasdaq rules require that our Audit Committee be composed entirely of independent members. Our Executive Committee on behalf of our Board of Directors has affirmatively determined that Mr. Christen, Ms. Liu and Ms. Pao each meet the definition of "independent director" for purposes of serving on the audit committee under Rule 10A-3 and Nasdaq rules. Each member of our Audit Committee meets the financial literacy requirements of Nasdaq listing standards. In addition, our Executive Committee on behalf of our Board of Directors has determined that Mr. Christen qualifies as an "audit committee financial expert," as such term is defined in Item 407(d)(5) of Regulation S-K. Our Audit Committee operates under a written charter which satisfies the applicable listing standards of Nasdaq and which is available on our website at investors.expensify.com.

220.    Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (i) the Company's revenue growth was exponentially susceptible to macroeconomic and structural challenges; (ii) consequently, the Company exaggerated the efficiency of Expensify's business model and the likelihood of success in meeting the long-term growth projections referenced in the Offering Documents; (iii) due to the foregoing, the Individual Defendants overstated Expensify's

post-IPO growth, business, and financial prospects; and (iv) the Company did not maintain adequate internal controls. As a result, Expensify's public statements were materially false and misleading at all relevant times.

221.    The 2023 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as the Individual Defendants violated the Code of Conduct, including by allowing false and misleading statements to be issued to the investing public.

222.    As a result of Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the appointment of Ernst & Young LLP as the Company's independent public accountants for the Fiscal Year 2023; and (3) make the future advisory vote frequency one year regarding the advisory vote on the compensation of the Company's named executive officers.

## The Truth Emerges

223.    The truth began to emerge on June 12, 2023, when Morgan Stanley downgraded the Company from Equal-weight to Underweight. Morgan Stanley cited Expensify's risk-reward profile and structural challenges for the primary reasons behind the downgrade.

224.    Further, analyst James Faucette of Morgan Stanley stated, "We expect EXFY to face challenges near-term as the core business works through structural and macro-related headwinds, and new product contribution remains highly uncertain."

225. Additionally, Morgan Stanley cut its estimates for Expensify's 2023/2024 revenue to $163.4M/$175.1M from $183.4M/$203.9M and cut its stock price target for Expensify to $5 from $9, implying a 30.3% potential downside to the Company's last close.

226. On this news, the Company's common stock price fell $0.45 per share, or 6.28%, to close at $6.72 per share on June 12, 2023.

227. The truth continued to emerge on August 8, 2023 when the Company issued a press release to announce its Q2 2023 Results. The Company reported GAAP EPS of -$0.14, missing the consensus estimate of -$0.07. Additionally, the press release stated, in relevant part:

**Financial:**

- ***Revenue was $38.9 million, a decrease of 10% compared to the same period last year.***

- Utilized $0.4 million cash in operating activities and generated $1.1 million of free cash flow.

- ***Net loss was $11.3 million, compared to $8.0 million for the same period last year***.

- ***Non-GAAP net loss was $1.0 million.***

- Adjusted EBITDA was $2.2 million.

Interchange derived from the Expensify Card grew to $2.7 million, an increase of 56% compared to the same period last year.

**Business:**

- Paid members – ***Paid members were 742,000, a decrease of 2% from the same period last year.***

(Emphasis added).

228. On the same day of August 8, 2023, the Company discussed the Q2 2023 Results in an earnings call with investors and analysts. During the question-and-answer portion of the earnings conference call, an analyst asked Defendant Muralidharan whether the Company intended

to reaffirm its previously issued long-term 25%-35% revenue guidance. Defendant Muralidharan responded to the analyst, in relevant part:

> […] I'll say this for a few quarters now, since the day we went public really, we have not been in sort of normal or stable economic conditions.
>
> **And for a few quarters now, we keep reaffirming that long-term guidance, and we keep getting questions all around and they're fair, when will this long-term guidance actually, be true since we haven't been close to the long term guidance in terms of growth.**
>
> So we actually took all of your feedback and removed it because we just don't know what we don't know. We haven't been in stable condition since 2020 with this or that or the other. Like first there was a pandemic, then there was concerns of the global recession, then there was a global recession. There still is, like I'm fuzzy on the details, but very chaotic.
>
> **So we've removed it and then once we sort of hit stability again, we will be able to reaffirm it, but we don't want to keep giving you outdated long-term guidance, if you will. So that's the reason we took it away.**

(Emphasis added)

229.    As a result of these disclosures, JMP Securities issued an analyst report on August 9, 2023, where it downgraded Expensify from Market Outperform to Market Perform. It cited the following reasons for doing so:

> 1) we do not see a clear inflection point for the business within the next year after revenue has shrunk in each of the last two quarters, both year over year and sequentially on a GAAP basis, with the declining top line affecting profitability and cash flow in 2Q;
>
> 2) our impression is the company remains in investment mode and is prioritizing the longer-term product roadmap, rather than incremental monetization in an increasingly competitive space, which is unlikely to get public market investors excited in the near term, in our opinion; and
>
> 3) the company disclosed that paid member count came in at 719K in July, down from the three-month average of 742K in 2Q.

230.    On this news, the Company's stock price fell further. The stock price fell $1.69 per share, or 28.55% to close at $4.23 per share on August 9, 2023.

231.    The truth fully emerged on November 7, 2023, when the Company issued a press release announcing Q3 2023 Results. The Company reported a GAAP EPS of -$0.21. Additionally, the press release revealed:

**Financial:**

- ***Revenue was $36.5 million, a decrease of 14% compared to the same period last year***.

- The Company utilized $5.1 million cash in operating activities.

- Free cash flow was $(7.1) million.

- ***Net loss was $17.0 million, compared to $8.2 million for the same period last year***.

- ***Non-GAAP net loss was $6.7 million***.

- Adjusted EBITDA was $(3.5) million.

- Interchange derived from the Expensify Card grew to $3.1 million, an increase of 65% compared to the same period last year.

- Immediately following the end of the current quarter, the Company deployed $36.0 million of available cash to further reduce outstanding debt by paying off its term loan in full.

**Business:**

- **Paid members** – ***Paid members were 719,000, a decrease of 6% from the same period last year.***

(Emphasis added).

232.    That same day, Expensify hosted an earnings call with investors and analysts to discuss the Company's Q3 2023 financial and operating results, in which Defendant Schaffer discussed the Company's quarterly revenue results, stating in relevant part:

So, revenue was $36.5 million, which is a 14% decrease from the same period last year. That's driven by a number of things. One is a decrease in activity and our user base. And Anu [Muralidharan] just spoke about user expansion being one of the biggest growth drivers for Expensify.

*And in recent periods, we've actually seen the growth expansion decrease, that's in the 12, 13-plus years of the company, that's really only happened twice and once with in COVID and once it's right now. So in the history of the company, generally, our customers once they onboard, they stay and they grow. What we're seeing now is a decrease in activity from our customers, which is causing a headwind to revenue.*

233.     After the Company made these disclosures, Piper Sandler published an analyst report that same day, on November 7, 2023, entitled "Mired in Another Quarter of Execution Missteps; Lowering Estimates, PT of $2." In the report, Piper Sandler reduced the target price of the Company's common stock from $4.00 to $2.00, citing "increasing execution risks and lower estimates." Piper Sandler's report further stated the following:

Q3 revenue declined on a q/q and y/y basis for the third straight quarter to $36.5M, which was the lowest reported level in two years, resulting in a [Free Cash Flow] burn of $7M this quarter. Paid subscriber metrics declined q/q for the third straight quarter, in part exacerbated by an esoteric pricing policy where SMB customers are required to only pay for 'active' users in a given month. The number of active subscribers in a given quarter is roughly one-third of the total installed base.

• Ninth straight quarter of eroding growth. Q3 revenue declined 14% y/y to $36.5M on a $2.7M top-line miss, negatively impacted by a 6% y/y decline in paid subscriber metrics (down 23K q/q to 719K paid members) and another double-digit decline in subscription ARPU. EBITDA margin contracted meaningfully to -9.7% (vs. 4-quarter avg: 18.5%).

. . .

• Internal missteps exacerbated by external challenges. Outsized exposure to SMBs and VSBs has led to a number of internal challenges that now appear to be exacerbated by external challenges. Paid subscriber count eroded for the third consecutive quarter driven by one-third of employees being active in a given month (pricing flaw = internal challenge). Additional macro pressures are now resulting in more SMB customers downsizing and in some cases going under (macro headwinds = external challenge).

234.     On this news, Expensify's common stock price continued to fall. The stock price fell $1.07 per share, or 36.89%, to close at $1.83 per share on November 8, 2023.

## REPURCHASES DURING THE RELEVANT PERIOD

235.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its own common stock that substantially damaged the Company.

236.    According to a Form 10-Q the Company filed with the SEC on August 9, 2023 for the quarterly period ended June 30, 2023, between May 1, 2023 and May 31, 2023, the Company purchased 504,493 shares of its own common stock at an average price of $5.93 per share for approximately $2,991,643.49. As the Company's stock was actually worth only $1.83 per share, the price at closing on November 8, 2023, the Company overpaid by approximately $2,068,421.30 for repurchases of its own stock between May 1, 2023, and May 31, 2023.

## DAMAGES TO EXPENSIFY

237.    As a direct and proximate result of the Individual Defendants' conduct, Expensify has lost and expended, and will continue to lose and expend, many millions of dollars.

238.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

239.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

240.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

241.    Such losses include the Company's overpayment of more than $2.9 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

242.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including the personal profits of the four Individual Defendants who engaged in lucrative insider sales, netting proceeds of approximately $11,905,952 during the Relevant Period.

243.    As a direct and proximate result of the Individual Defendants' conduct, Expensify has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

244.    Plaintiff brings this action derivatively and for the benefit of Expensify to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, officer, and director of Expensify, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for contribution under Section 11(f) of the Securities Act and Section 21D of the Exchange Act, and for violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act.

245.    Expensify is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

246.    Plaintiff is, and has been at all relevant times, a shareholder of Expensify. Plaintiff will adequately and fairly represent the interests of Expensify in enforcing and prosecuting its

rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

247.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above, as though fully set forth herein.

248.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Director-Defendants who were on the Board at the time this action commenced.

249.    Demand is excused as to all the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

250.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Expensify to make the materially false and misleading statements alleged herein. Specifically, the Director-Defendants knowingly or recklessly made material misrepresentations and/or omissions for the purpose and effect of concealing Expensify's financial well-being and prospects from the investing public and supporting the artificially inflated price of Expensify's securities. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. Moreover, Director-Defendants solicited the 2022 Proxy Statement and

2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. As a result of the foregoing, demand would be futile, and thus excused, as to all of the Director-Defendants, since they all breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested.

251.    Additional reasons that demand as to Defendant Barrett is futile follow. Defendant Barrett is the Company's founder. Defendant Barrett serves as the Company's CEO and as a Company director. He also serves as the Chair of the Compensation Committee. Defendant Barrett has served as both the Company's CEO and as a Company director since 2009. The Company provides Defendant Barrett with his principal occupation for which he receives handsome compensation. In Fiscal Year 2021 and Fiscal Year 2022, Defendant Barrett made a combined total of $21,622,445. Additionally, Defendant Barrett is a controlling shareholder of the Company. Thus, as the Company admits, he is a non-independent director. Moreover, Defendant Barrett solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. Furthermore, Defendant Barrett engaged in lucrative insider trading, reaping personal profits exceeding $5,780,964. As the Company's CEO, Defendant Barrett was ultimately responsible for all the false and misleading statements and omissions that were made, including those contained in the Offering Materials, which he personally signed. As the Company's highest officer, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant

Barrett is a defendant in the Securities Class Action. For these reasons, too, Defendant Barrett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

252.    Additional reasons that demand as to Defendant Schaffer is futile follow. Defendant Schaffer has served as a Company director since 2017. Defendant Schaffer also serves as a member of the Compensation Committee and as the Company's CFO. The Company provides Defendant Schaffer with his principal occupation for which he receives handsome compensation. In Fiscal Year 2021 and Fiscal Year 2022, Defendant Schaffer made a combined total of $10,127,570. Thus, as the Company admits, he is a non-independent director. Additionally, Defendant Schaffer solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. Furthermore, Defendant Schaffer engaged in lucrative insider trading, reaping personal profits exceeding $645,298. As the Company's CFO, Defendant Schaffer was ultimately responsible for all the false and misleading statements and omissions that were made, including those contained in the Offering Materials, which he personally signed. As a trusted Company director and CFO, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Schaffer is a defendant in the Securities Class Action. For these reasons, too, Defendant Schaffer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

253.    Additional reasons that demand as to Defendant Muralidharan is futile follow. Defendant Muralidharan has served as a Company director since January 2021. Defendant Muralidharan also serves as a member of the Compensation Committee and as the Company's COO. The Company provides Defendant Muralidharan with her principal occupation for which she receives handsome compensation. Thus, as the Company admits, she is a non-independent director. In Fiscal Year 2021 and Fiscal Year 2022, Defendant Muralidharan made a combined total of $6,338,119. Thus, as the Company admits, she is a non-independent director. Additionally, Defendant Muralidharan solicited the 2022 and 2023 Proxy Statements, both of which contained material misrepresentations and omissions that led to the re-election of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. Furthermore, Defendant Muralidharan engaged in lucrative insider trading, reaping personal profits exceeding $347,920. As a trusted Company director and COO, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Muralidharan breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

254.    Additional reasons that demand as to Defendant Mills is futile follow. Defendant Mills has served as a Company director since May 2021. Defendant Mills also serves as a member of the Compensation Committee and as the Company's CPO. Thus, as the Company admits, he is a non-independent director. Additionally, Defendant Mills solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of the Director-Defendants, allowing them to continue to breach their

fiduciary duties to the Company. As a trusted Company director and CPO, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Mills breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

255.    Additional reasons that demand as to Defendant Vidal is futile follow. Defendant Vidal has served as a Company director since May 2021. Defendant Vidal also serves as a member of the Audit Compensation Committee and as CSO. Thus, as the Company admits, he is a non-independent director. Additionally, Defendant Vidal solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. Furthermore, Defendant Vidal engaged in lucrative insider trading, reaping personal profits exceeding $131,770.  As a trusted Company director and CSO, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Vidal breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

256.    Additional reasons that demand as to Defendant Christen is futile follow. Defendant Christen has served as a Company director since November 2021. Defendant Christen serves as

the Chair of the Audit Committee. Additionally, Defendant Christen solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Christen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

257.    Additional reasons that demand as to Defendant Pao is futile follow. Defendant Pao has served as a Company director since November 2021. Defendant Pao is also a member of the Audit Committee. Defendant Pao solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company.  As a trusted Company director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Pao breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

258.    Additional reasons that demand as to Defendant Liu is futile follow. Defendant Liu has served as a Company director since November 2021. Defendant Liu also serves as a member

of the Audit Committee. Defendant Liu solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Liu breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

259.    Additional reasons that demand on the Board is futile follow.

260.    All the Director-Defendants benefitted directly from the wrongdoing alleged herein, as the false and misleading statements caused the Company's stock price to be artificially inflated, thus increasing the value of Expensify stock held by the Director-Defendants.

261.    Demand in this case is further excused because Defendants Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu are beholden to and controlled by Defendant Barrett, a primary interested wrongdoer who is Expensify's controlling shareholder and was Expensify's controlling shareholder during the Relevant Period. As such, Defendant Barrett controls their continued nomination to the Board. In light of this of this control, Defendants Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu cannot impartially consider a demand against Defendant Barrett, an interested, primary wrongdoer, as they are dependent on him for their continued employment with the Company and the compensation that goes with that. Thus, Defendants Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu are unable to evaluate a demand with disinterest or independence given Defendant Barrett's control over them.

262.    Each of the Director-Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by approximately $2.9 million for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

263.    Defendants Christen, Pao, and Liu (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

264.    Defendants Barrett (as Chair), Muralidharan, Schaffer, Vidal, and Mills (the "Compensation Committee Defendants") served as members of the Compensation Committee during the Relevant Period. As such, they were responsible for determining the compensation of

the Company's officers and directors, including the Director-Defendants as a result of the Director-Defendants soliciting the 2022 and the 2023 Proxy Statement which contained false and misleading statements and omitted material facts. In particular, the Compensation Committee Defendants ensured that certain of the Individual Defendants were motivated to issue false and misleading statements and to artificially inflate the growth and overall performance of the Company by awarding the Individual Defendants' compensation. In Fiscal Year 2022, the Compensation Committee Defendants provided personal material benefits to three of the Director-Defendants in the form of salary, stock awards, bonuses, and/or all other forms of compensation while the Director-Defendants were breaching their fiduciary duties to the Company. Specifically, Defendants Barrett, Schaffer, and Muralidharan, received $1,654,892, $874,840, and $470,657, respectively, in compensation for Fiscal Year 2022. Therefore, Defendants Barrett, Schaffer, and Muralidharan are unable to independently and disinterestedly assess a demand against the Compensation Committee Defendants as they have received, and continue to receive, material personal benefits from them. Moreover, all the Director-Defendants—including the Compensation Committee Defendants—breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

265.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules,

and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

266.    Expensify has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Expensify any part of the damages Expensify suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

267.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's Audit Committee Charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

268.    The acts complained of herein constitute violations of fiduciary duties owed by Expensify's controlling shareholders, officers, and directors, and these acts are incapable of ratification.

269.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate

funds, i.e., monies belonging to the stockholders of Expensify. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Expensify, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

270.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Expensify to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

271.    Thus, for all the reasons set forth above, all the Director-Defendants, and, if not all of them, at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

272.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

273.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

274.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

275.    Under the direction and watch of the Individual Defendants, the 2022 Proxy Statement and the 2023 Proxy Statement failed to disclose that: (i) the Company's revenue growth was exponentially susceptible to macroeconomic and structural challenges; (ii) consequently, the Company exaggerated the efficiency of Expensify's business model and the likelihood of success in meeting the long-term growth projections referenced in the Offering Documents; (iii) due to the foregoing, the Individual Defendants overstated Expensify's post-IPO growth, business, and financial prospects; and (iv) the Company did not maintain adequate internal controls. As a result, Expensify's public statements were materially false and misleading at all relevant times.

276.    Under the direction and watch of the Individual Defendants, the 2022 Proxy Statement and the 2023 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 Proxy Statement's and the 2023 Proxy Statement's descriptions of the

Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

277.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement and the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement and the 2023 Proxy Statement, including the election of directors, advisory approval of executive compensation, and ratification of the appointment of an independent registered public accounting firm.

278.    As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders voted to re-elect Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu to the Board, thus allowing them to continue breaching their fiduciary duties to Expensify.

279.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 Proxy Statement.

280.    As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders voted to re-elect Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu to the Board, thus allowing them to continue breaching their fiduciary duties to Expensify.

281.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

282.    Plaintiff, on behalf of Expensify, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

283.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

284.    The Individual Defendants, by virtue of their positions with Expensify and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Expensify and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Expensify to engage in the illegal conduct and practices complained of herein.

Plaintiff, on behalf of Expensify, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

285.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Expensify. Not only is Expensify now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Expensify by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase more than one hundred thousand of its own shares at artificially inflated prices, damaging Expensify.

286.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Expensify not misleading.

287.    The Individual Defendants, as top executives and directors of the Company are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as controlling shareholders, officers, and directors of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Expensify.

288.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

289.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

290.    Plaintiff, on behalf of Expensify, has no adequate remedy at law.

## <u>FOURTH CLAIM</u>

### Against the Individual Defendants for Breach of Fiduciary Duties

291.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

292.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Expensify's business and affairs.

293.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

294.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Expensify.

295.    In breach of their fiduciary duties owed to Expensify, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that (i) the Company's revenue growth was exponentially susceptible to macroeconomic and structural challenges; (ii) consequently, the Company exaggerated the efficiency of Expensify's business model and the likelihood of success in meeting the long-term growth projections referenced in the Offering Documents; (iii) due to the foregoing, the Individual Defendants overstated Expensify's post-IPO growth, business, and financial prospects; and (iv) the Company did not maintain adequate internal controls. As a result, Expensify's public statements were materially false and misleading at all relevant times.

296.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

297.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

298.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Expensify's securities, and disguising insider transactions.

299.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Expensify's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

300.    In a result of the material misstatements and omissions contained in the 2022 and 2023 Proxy Statements, Company shareholders voted to re-elect the Director-Defendants to the Board, thus allowing them to continue breaching their fiduciary duties to Expensify.

301.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase hundreds of

thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed, while four of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $11,905,952.

302.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

303.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Expensify has sustained and continues to sustain significant damages.

304.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

305.    Plaintiff, on behalf of Expensify, has no adequate remedy at law.

**FIFTH CLAIM**

**Against Individual Defendants for Unjust Enrichment**

306.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

307.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Expensify.

308.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Expensify that was tied to the performance or artificially inflated valuation of Expensify, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

309.    Plaintiff, as a shareholder and representative of Expensify, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or

valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

310. Plaintiff, on behalf of Expensify, has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Abuse of Control

311. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

312. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Expensify, for which they are legally responsible.

313. As a direct and proximate result of the Individual Defendants' abuse of control, Expensify has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Expensify has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

314. Plaintiff, on behalf of Expensify, has no adequate remedy at law.

## SEVENTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

315. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

316. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Expensify in a manner consistent with the operations of a publicly-held corporation.

317.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Expensify has sustained and will continue to sustain significant damages.

318.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

319.    Plaintiff, on behalf of Expensify, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

320.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

321.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

322.    In addition, the Individual Defendants caused the Company to repurchase hundreds of thousands of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

323.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

324.    Plaintiff, on behalf of Expensify, has no adequate remedy at law.

## NINTH CLAIM

### Against Defendants Barrett, Schaffer, Bartlett, and Lent for Contribution Under Section 11(f) of the Securities Act and Section 21D of the Exchange Act

325.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

326.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of Expensify shareholders, in which it is a joint tortfeasor in claims brought under Section 11 and 15 of the Securities Act.

327.    Federal law provides Expensify with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

328.    The plaintiffs in the Securities Class Action allege that the Offering Documents contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

329.    Expensify is the registrant for the Offering. Defendants Barrett, Schaffer, Bartlett, and Lent were responsible for the contents and dissemination of the Offering Documents.

330.    As issuer of the shares, Expensify is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

331.    The plaintiff in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents and other subsequent public filings were true and without omissions of any material facts and were not misleading.

332.    Defendants Barrett, Schaffer, Bartlett, and Lent, because of their positions of control and authority as controlling shareholders, officers, and directors of Expensify, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Expensify, including the wrongful acts complained of herein and in the Securities Class Action.

333. Accordingly, Defendants Barrett, Schaffer, Bartlett, and Lent are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

334. As such, Expensify is entitled to receive all appropriate contribution or indemnification from Defendants Barrett, Schaffer, Bartlett, and Lent.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Expensify, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Expensify;

(c) Determining and awarding to Expensify the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Expensify and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Expensify and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Expensify to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Expensify restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.


Dated: December 18, 2024                    Respectfully submitted,
                                           **CHENOWETH LAW GROUP**

                                           */s/ Aurelia Erickson*
                                           Robert J. McGaughey, OSB No.800787
                                           Aurelia Erickson, OSB No. 126170
                                           510 SW Fifth Avenue, 4th Floor
                                           Portland, OR  97204
                                           Phone: (503) 221-7958
                                           Fax:  (503) 221-2182
                                           Email: bobm@chenowethlaw.com
                                           Email: aerickson@chenowethlaw.com
                                           *Liaison Counsel for Plaintiff*

**PORTNOY LAW**
Lesley F. Portnoy, Esq.
(*pro hac vice* application forthcoming)
1800 Century Park East, Suite 600
Los Angeles, CA 90067
Telephone: (310) 692-8883
Email: lesley@portnoylaw.com

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Diana Da Silva, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this ___ day of November, 2024.

11/25/2024

DocuSigned by:

*Diana Da Silva*

5F23E085737943D...

Diana Da Silva